ISAAC R. ALTER ET AL. v. BANK OF STOCKHAM ET AL.

FILED DECEMBER 22, 1897.  No. 7189.

1. **Sale of Cattle:** EVIDENCE OF FALSE WEIGHT.  Evidence examined,
   and *held* not to support the finding of the jury that plaintiffs in
   error had falsely weighed certain cattle sold one of the defendants
   in error.  NORVAL, J., and IRVINE and RYAN, CC., dissenting.

2. **Fraud.**  Fraud is not to be presumed; it must be proved.

3. ———: EVIDENCE.  If, from the entire evidence on the subject, good
   faith or an honest mistake may be as rationally and reasonably in-
   ferred as fraud, then the law leans to the side of innocence.

4. ———: ———.  Direct evidence is not essential to establish fraud.
   It may be inferred from circumstances; but such inference must
   not be guesswork or conjecture, but the rational and logical deduc-
   tion from the circumstances proved.

5. **Equity:** QUESTIONS OF FACT FOR JURY.  A district court while sitting
   as a court of equity is clothed with the inherent power to submit to
   a jury any question of fact in the case.

6. **Actions:** FORMS: PLEADING.  To maintain a civil action under our

Code, it is not essential that the action be denominated either an action at law or in equity, nor that it be given any particular name. If the litigant pleads the facts, and they constitute a cause of action or defense, the courts are bound to award the relief due.

7. **Chattel Mortgages:** SALE OF CHATTELS: CONVERSION BY MORTGAGOR: TRUSTS: REMEDY OF MORTGAGEE. Evidence examined and *held* that the district court erred in dismissing the action of the plaintiffs in error.

8. ——: ——: ——: ——: ——. Where a mortgagor of chattels converts the same into cash, at their full value, and deposits the money with his agent, who has notice of the mortgage lien, an action will lie at the suit of the mortgagee against such agent, for the proceeds of such property; and the fact that the mortgagee did not pursue and seize the mortgaged property does not, of itself, afford such agent a defense to such action.

REHEARING of case reported in 51 Neb. 797. *Reversed.*

*Hainer & Smith,* for plaintiffs in error.

*A. W. Agee* and *H. M. Kellogg, contra.*

RAGAN, C.

This is a rehearing of *Alter v. Bank of Stockham,* 51 Neb. 797. In their petition in the district court Alter & Glover alleged the sale by them on September 26, 1889, of 309 head of cattle, to one Wiens, at an agreed price of $8,500; that, as an evidence of said indebtedness, Wiens executed to Alter & Glover his note for said sum of money drawing interest at the rate of ten per cent from date, and due April 1, 1890, and secured the payment of the same by a chattel mortgage upon all said cattle; that said chattel mortgage was duly filed in the office of the county clerk of Hamilton county, soon after its execution,—that being the county in which Wiens lived and kept said cattle; that there was due and unpaid on said note $1,606.65, with interest at ten per cent per annum from May 21, 1890; that Wiens subsequent to the purchase of said cattle executed to said bank two chattel mortgages covering the same cattle; that said mortgages were taken by the Bank of Stockham subject to Alter &

Glover's mortgage; that on January 8, 1890, the bank took possession of 41 head of said mortgaged cattle, shipped them to Martin Bros., commission merchants in South Omaha, Nebraska, and caused them to be there sold on the open market, and the net proceeds of said sale,—$1,330,—to be deposited to its credit in a bank there; that, on March 8, 1890, the Bank of Stockham took possession of 127 head of the cattle, on which Alter & Glover held a mortgage, shipped them to South Omaha, Nebraska, to said Martin Bros., caused the cattle to be there sold in the open market, and the proceeds of said sale, amounting to $4,907.55, to be deposited to the credit of the Bank of Stockham in the Union Stock Yards Bank of South Omaha, and the said Bank of Stockham converted to its own use the said proceeds of $4,-907.55, except the sum of $2,000 of said proceeds, which it then and there remitted, or caused to be remitted, to Alter & Glover to apply on the Wiens note; that the shipments and sales of the Wiens cattle made by the Bank of Stockham on January 8 and March 9, 1890, were made without the knowledge or consent of plaintiffs; that they had demanded of the Bank of Stockham a return of said cattle or a delivery of the proceeds of their sale, or so much thereof as would satisfy their mortgage debt against Wiens; that the Bank of Stockham had refused to deliver the cattle or pay over the proceeds, or any portion of them, but had retained said proceeds and had converted them to their own use; that since the sale of the cattle the plaintiffs had been unable to discover their whereabouts, and unable to pursue them, and subject them to the payment of their mortgage debt; that the Bank of Stockham, at the time it received and converted the proceeds of the cattle sold in January and March, 1890, to its own use, did so with the intent to defraud the plaintiffs out of their lien on said cattle, and took the proceeds of said sale and retained them, with full knowledge of plaintiffs' lien on the cattle. The petition then alleged the insolvency of Wiens, and

prayed that an account might be taken of the amount due them on the Wiens note and mortgage; that the priorities of liens of the plaintiffs and the Bank of Stockham should be determined by the court; that the amount found due the plaintiffs and Wiens might be adjudged a first lien upon the mortgaged property, and that the Bank of Stockham might be decreed to hold the proceeds of the sale of the cattle in trust for the use and benefit of the plaintiffs and decreed to pay the same over to the plaintiffs. The answer of the Bank of Stockham, so far as material here, was a general denial of the averments of Alter & Glover's petition, coupled with the averment that Alter & Glover, from the proceeds of the sale of a part of the mortgaged cattle shipped and sold by them in May, 1890, had realized more than sufficient to pay the amount of their mortgage debt. Wiens intervened in the action and filed an answer in the nature of a cross-petition, in which he alleged that he purchased the 309 head of cattle from Alter & Glover, and gave his note for $8,500 for the purchase price; that Alter weighed these cattle, announcing the weights to be 364,330 pounds, or an average of 1,179 pounds per head; and that he, Wiens, relied on the honesty of Alter in weighing the cattle, and that the latter falsely and fraudulently weighed them; that their total weight did not exceed 287,080 pounds, or an average of 929 pounds each; that the actual value of the cattle, had they been correctly weighed, was $6,688.38; and that the note was given for $1,811.62 too much. The answer then alleged that what was justly due on the note had been paid, and the debt overpaid $454.85, for which sum Wiens asked a judgment against Alter & Glover. The trial resulted in the district court pronouncing two judgments: (1.) That there was due to Alter & Glover from Wiens on his note $828.91,—about one-half of what Alter & Glover claimed was due upon it; and this judgment was based upon the finding of the jury that Alter & Glover falsely weighed the cattle at the time they sold them to Wiens. (2.) The

second judgment pronounced by the court was one dismissing the plaintiffs' action against the Bank of Stockham. It is to reverse both these judgments that Alter & Glover have prosecuted here a petition in error.

1. Is the finding of the jury that Alter & Glover falsely weighed these cattle at the time they were sold by them to Wiens supported by sufficient evidence? Wiens, to sustain his contention that the cattle were falsely weighed, introduced evidence which showed, or tended to show, the following state of facts: He purchased the cattle from Alter & Glover September 26, 1889. At that time the cattle were at a railway station some miles from the city of Grand Island. The cattle were then driven to Grand Island, and there weighed on the scales in the stock yards of the Union Pacific Railway Company. Wiens and his son were both present at the scales while the cattle were being weighed, though Alter did the actual weighing, calling off the weights of each bunch to Wiens. Wiens, after receiving the cattle, on that day or the next, drove them to his farm in Hamilton county, where he kept them in lots, or in a field, fed them an abundance of hay and corn, and furnished them plenty of water. In other words, he took proper care of the cattle, and properly fed them and watered them. On January 8, 1890, 41 head of the cattle were shipped to South Omaha, and there sold, and these cattle there weighed 48,800 pounds at that time. On March 9, 1890, 127 head of the cattle were shipped to South Omaha, and sold, and there at that time weighed 153,100 pounds; and on May 21, 1890, 126 head of the cattle were shipped to South Omaha, and there sold, and these cattle there at that time weighed 154,840 pounds. In other words, 309 head of the cattle purchased of Alter & Glover at the time of their purchase weighed 364,330 pounds, and 294 head of the same cattle, when sold in January, March, and May, 1890, weighed only 356,740 pounds, or 7,590 pounds less than all the cattle weighed at the time they were purchased; that the scales on which the cattle

were weighed in Omaha were of the Fairbanks manufacture, were in good order, and weighed correctly, and the party who weighed the cattle there weighed them honestly. Wiens also introduced the evidence of a number of farmers and cattle feeders, who testified as experts, to the effect that they were acquainted with these cattle, saw them at the time Wiens was feeding them, and that in their opinion the cattle had gained in weight after Wiens purchased them, and that taking into consideration the character of the cattle, the care taken of them by Wiens, and the feed which they had consumed, these cattle should have gained, and did probably gain, from the time they were purchased by Wiens until they were shipped, an average of 250 to 300 pounds per head. On behalf of Alter & Glover, the evidence tended to show that they were in the business of buying and selling cattle, and had been for some years prior to the time they sold these cattle to Wiens; that they had sold him cattle the year previous to this sale, and that those cattle, after being fed some months by Wiens, had showed a gain in weight; that Alter himself personally weighed these cattle to Wiens, and that he honestly and correctly noted the weight of each bunch of cattle, and honestly and correctly reported the weight of each bunch to Wiens; that Wiens and his son were both present at the time the cattle were weighed,—each one of them being within a few feet of the scale beam and each one of them having the opportunity to see for himself what weight the scale indicated for each bunch of cattle weighed out; that these cattle were known as "Southwestern cattle," or "half-breeds,"—some of them being "scalawags;" that they were very wild; that in driving them from Grand Island over to Wiens' farm in Hamilton county 30 head of them escaped, some of which were never recovered; that, after Wiens had put the cattle into his feed lots on his farm, they broke out of it, broke into a field of corn, and he permitted them to remain in that cornfield; that he dehorned something over 200 of these cattle, and

would have dehorned the remainder if they had not been so wild he could not catch them; that cattle so wild as these did not fatten and gain in flesh so readily as tame or domestic cattle; that the cattle were liable to be foundered and injured so as not to fatten when allowed to run in a field of corn, as by so doing they were liable to eat too much, and that the dehorning of cattle had a tendency to prevent their fattening and gaining in weight.   Alter & Glover also showed that these 309 head of cattle sold Wiens were part of a bunch of 616 head of cattle; that they had sold 307 of this bunch to a man named Nordgreen, while they were at the railway station, some distance from Grand Island, and that they divided these cattle into two equal bunches, as near as might be, before Wiens' cattle were weighed and delivered; that the 307 head of cattle taken by Nordgreen, after remaining for two weeks on a grass pasture, were brought into Grand Island, weighed upon the same scales that Wiens' cattle were weighed on, and the 307 head of Nordgreen cattle weighed 363,650 pounds, or that Nordgreen's cattle weighed 680 pounds less than Wiens' 309 cattle; that Wiens never made any complaint about the weight of these cattle until after this suit was brought, and that a large number of these cattle, when sold in Omaha, were very lean.

Our opinion is that the evidence does not sustain the finding made by the jury that Alter falsely weighed these cattle, or any of them, when he sold them to Wiens.   It is not claimed or pretended by anybody that there was any mistake made; that the scales at Grand Island were not good scales, and in good order; but the jury finds from the evidence, which we have just quoted, that Alter falsely weighed these cattle, and committed a crime. Fraud is not to be presumed.   It must be proved; and, while it may be established by circumstantial evidence, yet if the reasonable inference from all such evidence does not preponderate toward the conclusion of fraud, then such evidence will not sustain such finding.   In

other words, if, from the entire evidence on the subject, good faith or an honest mistake even may be as rationally and reasonably inferred as fraud, then the law leans to the side of innocence. While, to prove fraud direct evidence is not essential, and the inference of fraud may be drawn from facts and circumstances, such inference must not be the guess-work or conjecture of a jury, but the inference must be the rational and logical deduction from the facts and circumstances from which it is inferred. There is just as much evidence in this record to convict the man who weighed these cattle at Omaha of fraud in weighing them as there is to convict Alter of a fraud, and the evidence will not sustain the conviction of either of them of that offense. We reach the conclusion therefore that the judgment pronounced by the district court in favor of Alter & Glover against Wiens must be reversed because the finding on which it is based is unsupported by sufficient evidence.

2. There was much contention in the district court—and the contention is renewed here—as to whether the petition of Alter & Glover states a cause of action at law or in equity; and plaintiffs in error complain here because the district court submitted to a jury the issues of fact made by the pleadings. It is insisted here by the plaintiffs in error that their petition is one in equity for an accounting of the amount due them from Wiens on their mortgage debt, and to hold the Bank of Stockham liable to it as trustee. On the other hand the bank contends that the action was one at law, being simply a suit for conversion of the proceeds of the sale of the Wiens cattle. Under our Code there is but one form of action, namely, a civil action; and the distinction heretofore existing between actions at law and actions in equity, so far as the form of such actions is concerned, is abolished. But, if the action of Alter & Glover is one in equity, we cannot reverse the judgment of the district court solely because of the fact that it submitted questions of fact to a jury. A chancellor was always invested

with the discretion to submit to a jury issues of fact and the Code has not deprived the courts, when sitting as courts of equity, of that discretion, and the district courts of the state, while sitting as courts of equity, are vested with the discretion to submit to a jury any disputed question of fact. We cannot conceive how a district court can in any case commit a reversible error simply by submitting a question of fact to a jury. It is wholly immaterial whether the petition of Alter & Glover here be one in equity or one at law. The Code requires the pleader to state the facts which constitute his cause of action or defense, and if he state these facts,—not conclusions,—and they constitute a cause of action or defense, the law will award him the relief to which he is entitled, whether the facts make a case in equity or at law. The litigant does not need to designate his action one for conversion, or to give it any name. If the pleading states the facts, and the proof sustains the plea, the court is bound to afford the relief due, whether the action be one which at common law was known as an "action of conversion," or whether it be of such a character that no name can be found for it in the books of pleading and practice.

3. This brings us to the consideration of the judgment of the district court dismissing Alter & Glover's action against the Bank of Stockham. After Alter & Glover had put in their evidence, the district court instructed the jury to return a verdict in favor of the Bank of Stockham, which it did, and thereupon the court entered a judgment dismissing Alter & Glover's action against that bank. The evidence introduced by Alter & Glover against the Bank of Stockham was as follows: The deposition of one Sears, a bookkeeper for Martin Bros., commission merchants of South Omaha. He testified:

Q. You may state if they [Martin Bros.] received any cattle for sale during the month of January, 1890, from one Wiens.

A. Yes, we received two loads of cattle on January 8 from Wiens.

Q. What was done with those cattle?

A. They were sold there at South Omaha.

Q. What disposition was made of the proceeds of the sale of those cattle?

A. The proceeds were deposited in the Union Stock Yards Bank of South Omaha, to the account of the Bank of Stockham, to the credit of Wiens, amount, $1,330.

Q. You may state whether any cattle was received by them [Martin Bros.] from Wiens during the month of March, 1890.

A. Yes; we received six loads on March 8, 1890; six car loads.

Q. What was done with the proceeds of the sale?

A. The proceeds were disposed the same as those of January 8; deposited in the same manner. The amount was $4,907.55.

Q. You may state whether this deposit was made by the direction of Wiens.

A. Yes, sir.

Q. Do you remember whether Mr. Wiens was present at the time of these sales, or either of them?

A. He was present at one of them, and I think he was at both, but I am not positive.

Another deposition read in Alter & Glover's behalf was that of William Wallace, cashier of the Omaha National Bank, of Omaha. He testified as follows:

Q. You may state whether the Bank of Stockham had an account with the Omaha National Bank during the months of January and March, 1890.

A. It had.

Q. You may state whether any deposits were made to that account by the Union Stock Yards Bank of South Omaha during the month of January, 1890.

A. Yes, sir.

Q. Are you able to state the date of such deposit?

A. Yes, sir.

Q. What date?

A. January 9, 1890.

Q. What was the amount of the deposit made to the credit of the Bank of Stockham by the Union Stock Yards Bank on the 9th of January, 1890?

A. $1,330.

Q. You may state whether that deposit was made for the credit or for the account of anybody else besides the Bank of Stockham.

A. It was not.

Q. State whether or not a deposit was made in your bank by the Union Stock Yards Bank during the month of March, 1890.

A. There was.

Q. You may give the date and the amount of that deposit.

A. March 10, $4,907.55.

Q. Was this deposited for the credit of any other person or firm?

A. No, sir.

Q. You may state if this account was subject to check by any other person or corporation except the Bank of Stockham.

A. No.

Q. Does the Bank of Stockham still keep an account with your bank?

A. Yes, sir.

Q. Was the money so deposited on the 9th of January and the 10th of March subject to its check, the same as other funds in your hands?

A. Yes, sir.

Q. State whether or not this money was deposited to any special account with that bank or to its general credit.

A. It was deposited to its general credit.

Cross-examination:

Q. State whether it was drawn upon by that bank, the same as any other money deposited to its credit.

A. Just the same as any other moneys.

Q. This money that was placed to their credit in Jan-

uary, 1890, was sent to the Omaha National Bank by some bank in South Omaha, was it?

A. Yes, sir.

Q. What bank was it that sent it?

A. Union Stock Yards.

Q. And it was the same with the deposit that was made on the 10th of March?

A. Yes, sir.

Q. Just sent to your bank by the Union Stock Yards of South Omaha?

A. Yes.

Q. To be placed to the credit of the Bank of Stockham?

A. Yes, sir.

Another deposition read on behalf of Alter & Glover was that of Carson, assistant cashier of the Union Stock Yards Bank of South Omaha. He testified as follows:

Q. You may state whether any moneys were deposited by them [Martin Bros.] with you for the credit of the Bank of Stockham during that month.

A. On the 8th of January they deposited with us to be remitted to the Omaha National Bank, to the credit of the Bank of Stockham, $1,330 for the use of Wiens.

Q. They deposited money with you for them with instructions to remit to Omaha for the credit of that bank?

A. Yes sir; on March 8th they deposited with us, to be remitted to the Omaha National Bank, $4,907.55, for the credit of the Bank of Stockham, and the use of Wiens.

We think the district court was mistaken in concluding from this evidence that Alter & Glover had no cause of action against the Bank of Stockham. None of this evidence was disputed. Wiens was indebted to Alter & Glover. To secure that indebtedness the latter held a chattel mortgage upon Wiens' cattle. The Bank of Stockham held mortgage liens against the same cattle which were, by their terms, made subject to Alter & Glover's mortgage, and the Bank of Stockham at all

times had notice of the existence of Alter & Glover's lien upon the Wiens' cattle. Wiens, the mortgagor, shipped these cattle to South Omaha and sold them at their full value in the public markets and thereby dissipated and destroyed, or at least deprived the mortgagees of, the subject-matter of the property covered by their mortgage and paid the proceeds of the sale over to the Bank of Stockham. This proof followed the allegations of Alter & Glover's petition, and established, as plain as anything could be established, that the Bank of Stockham had in its possession when this suit was brought, the proceeds of the sale of the Wiens cattle, upon which cattle Alter & Glover had a first mortgage lien, the mortgagor having converted the mortgaged property into money. The bank introduced no evidence, nor did it attempt to introduce any evidence, to show that it had any right, title, or claim to the proceeds of the sale of these cattle by reason of any fact whatsoever. So far as the record shows the bank held the moneys as the agent or bailee or debtor of Wiens, and, without doubt, Wiens could not hold the proceeds of the sale of these cattle as against the claim of Alter & Glover; and, if he could not hold them, his bailee could not. *Cone v. Ivinson*, 33 Pac. Rep. [Wyo.] 31, is a case almost identical with the one at bar, and in that case it was held that where a mortgagor of chattels sells the mortgaged property and pays the proceeds thereof to his creditor, the creditor at the time having knowledge of the existence of the chattel mortgage, such creditor was liable to the mortgagee for the proceeds of the sale of the mortgaged property. That case was decided on May 19, 1893. A rehearing was granted and the case was reconsidered and another opinion written adhering to the former conclusion, and reported in 35 Pac. Rep., 93. But the principle of the Wyoming case has been much extended by this court in *Cady v. South Omaha Nat. Bank*, 46 Neb. 756. In that case the owner of some cattle shipped them to a commission merchant in South

Omaha for sale. The commission merchant sold the cattle and deposited the proceeds to his own credit in a bank in South Omaha, with which he was doing business, the bank at the time having no knowledge or notice of the relation existing between the commission man and the owner of the cattle; and yet the court held that, irrespective of the question of notice, the bank held the proceeds of the sale of the cattle in trust for their owner. We are not deciding that the action of Alter & Glover is an action at law for conversion as against the Bank of Stockham, nor that it is a bill in equity seeking to have the Bank of Stockham declared a trustee and to hold the proceeds of the sale of the Wiens cattle in trust for Alter & Glover. What we do decide, and all we decide, is that from the uncontradicted evidence it appears that the mortgagor converted the mortgaged property into money and placed it in the hands of his agent, the Bank of Stockham, it then and there knowing of the existence of Alter & Glover's lien upon the cattle; and, as against the mortgagees, Wiens himself was not entitled to such proceeds; that the bank, on the evidence in this record, has no better title to the money than Wiens had, and is liable and should account to Alter & Glover for such proceeds, whether such a result will have the effect of making the action at bar one at law or in equity.

The judgment of the district court in favor of the Bank of Stockham and against Alter & Glover, and the judgment in favor of Alter & Glover and against Wiens, and each of them, are reversed and the cause remanded.

REVERSED AND REMANDED.

RYAN, C., adheres to the views already expressed.