FARMERS STATE BANK, APPELLEE, v. HOME STATE BANK,
APPELLANT.

FILED JULY 20, 1921.   No. 21719.

1.  **Chattel Mortgages: TRUST FUNDS.** Where a bank, with knowledge
of prior mortgage indebtedness on personal property, takes a
mortgage thereon, it being agreed between the mortgagor, the
owner of the property, and the bank that the property is to be
sold and the proceeds deposited in such bank, and out of the
proceeds the bank shall first pay the prior mortgage indebted-
ness against the property, *held* that, upon deposit of the proceeds
of the property in such bank, the bank becomes trustee of the
fund and holds the same in trust for the prior mortgagees; and,
in an action in equity by one of the prior mortgagees to subject
the trust fund to the payment of a balance due on one of the
prior mortgages (the proceeds of the property being sufficient to
pay the entire prior mortgage indebtedness against it), the fact
that the bank had applied a part of the trust fund in liquidation
of the mortgagor's indebtedness to the bank by his direction be-
fore or at the time of the application, thereby reducing the trust
fund to an amount insufficient to pay the prior mortgages, would
not constitute a defense to such an action; *held*, further, that
the relation of debtor and creditor did not exist between the
mortgagor and the bank, except as to any amount remaining
after the payment of the prior mortgages, and that the bank
must restore so much of the trust fund as is necessary to pay the
balance due the prior mortgagee bringing the suit. The prin-
ciple stated in *Alter v. Bank of Stockham*, 53 Neb. 223, that
"where a mortgagor of chattels converts the same into cash, at
their full value, and deposits the money with his agent, who has
notice of the mortgage lien, an action will lie at the suit of the
mortgagee against such agent, for the proceeds of such prop-
erty," followed.

2.  **Evidence** examined, and *held* to sustain the judgment of the trial
court.

APPEAL from the district court for Richardson county:
JOHN B. RAPER, JUDGE. *Affirmed.*

*Dort, Cain & Dort*, for appellant.

*Lambert & Armstrong*, contra.

Heard before MORRISSEY, C.J., FLANSBURG and ROSE,

JJ., DICKSON and TROUP, District Judges.

DICKSON, District Judge.

In October, 1919, W. D. Elmore purchased from W. H. Powers 26 head of steers at the agreed price of $3,570.25, and purchased from J. D. Roliff 20 head, for which he agreed to pay $2,551.25, and gave them his notes secured by mortgages on the cattle. Powers sold his note and mortgage to the appellee, Farmers State Bank of Stella, and Roliff sold his to the Bank of Steinauer. Neither mortgage was placed on record. The cattle were fed by Elmore at Humboldt until the last days of December, and were then shipped by him to Kansas City and sold for $7,150. The appellant bank received of the proceeds $7,100, which it placed to the credit of Elmore. During December Elmore became indebted to the appellant bank in the sum of $1,190.91, and about the 23d of December gave the bank his note and secured it by a chattel mortgage on the cattle purchased from Powers and Roliff, it being agreed that the cattle should be shipped and the proceeds deposited in the appellant bank, and out of the proceeds Elmore's indebtedness to the bank would be paid; the bank, however, agreed that it would first pay the mortgage debt against the cattle. The note given by Elmore to the appellant bank was to take up certain checks given principally for feed, which the bank had carried as cash items and overdrafts, and was taken more as a matter of form than as security, the bank seemingly relying on the assurance of Elmore that he would be able to take care of his indebtedness to the bank out of the proceeds of the cattle when sold, as he had done on other occasions. There was an unusual delay in getting cars, and in the mean time the price of cattle dropped from $2 to $3 a hundred pounds, an unexpected happening, and the proceeds were insufficient to pay the purchase-price mortgages and Elmore's indebtedness to the appellant bank.

The real question involved is whether the appellant

bank, when it took its mortgage on the cattle, had knowledge of the existence of the purchase-price mortgages, or notice of facts sufficient to impute notice to it of them. If it had, the judgment of the lower court is right.

There is little, if any, controversy as to what was said at the time of giving the mortgage to the appellant bank. Elmore, responding to the question, "Did you tell them how much you owed on the cattle?" answered, No, sir." Being asked the further question, "Anything said about your having given a mortgage on the cattle?" he said, "Nothing, only the time I signed that mortgage, I told him the paper on the cattle must be paid first, whichever I said." And again, on rebuttal, referring to the chattel mortgage note, he said: "When I went to give them the note, they drew out the note, before I seen (signed) it, I says to them, I says, now, boys, these cattle have got to be settled for first." Glenn D. Jenkins, one of the officers of the appellant bank, referring to the conversation with Elmore at the time of the giving of the bank's mortgage, said: "Well, there was nothing said except as he went to sign the note, he said to us, he says, now of course there is a mortgage against those and that will have to be paid, but there will be plenty of money." Otto Kotouc, another officer of appellant bank, when asked, "What did Elmore say relative to there being a first mortgage on these cattle at that time (referring to the time of giving of the note)?" answered, "Just as we were drawing up the note, why he said that there was a mortgage against the cattle, and of course that would have to be paid first." J. M. Wright, cashier of the appellee bank, testified that, at the time he went to Humboldt to take up with the appellant bank the matter of the payment of the check given by Elmore in settlement of the Powers note, Mr. Linn, an officer of the appellant bank, said: "He knew there was a mortgage on the cattle, but did not know where it was at." These questions and answers fairly reflect the evidence on the question of the bank's knowledge of the existence of the purchase-price mort-

gages on the cattle.

As showing the agreement between Elmore and the appellant bank concerning the payment of the mortgage indebtedness on the cattle, Glenn D. Jenkins, an officer of the bank, testified on cross-examination as follows: "Q. You understood you were to take what he owed you irrespective of what the first mortgage might be, did you? A. No, sir. Q. You understood, then, that the mortgage was against—incumbrance had to be first paid? A. We understood that there was a mortgage against it; yes, sir. Q. And you understood also that it should be paid out of the proceeds before you would get yours; didn't you? A. Yes, sir; we did."

As to what happened after the cattle were sold and the money received by the appellant bank, there is practically no dispute. Elmore accompanied the shipment to Kansas City, and returned by way of Stella, and advised the appellee bank of the shipment of the cattle and the amount received therefrom, and that the money had been deposited in the appellant bank, and on that day, December 31, gave to the appellee bank his check for $2,602.27, drawn on the appellant bank, in payment of the Powers mortgage. The appellant bank refused payment of this check January 7, and the next day Mr. Wright, cashier of the appellee bank, went to Humboldt and took the matter of the payment of this check up with the appellant bank. At this time Elmore had to his credit in the appellant bank $1,362.50, and this amount Mr. Wright obtained on the check of Elmore, the bank having previously charged to Elmore's account a check of $3,643.95 given by him in payment of the Roliff mortgage, together with other items of indebtedness (notes and checks), leaving the stated balance. Among the items that the appellant bank had charged to the account of Elmore was a note amounting to $538.35. This note had been given prior to the giving of the second mortgage note, and was secured by other personal property still in the possession of Elmore, and the bank arranged with Elmore to carry this note, and

later sent $522 of the $538.35 to apply on the debt of the appellee bank, which reduced its indebtedness to $720.80.

The appellant claims that the appellee knew and permitted the sale of the cattle, thereby waiving its lien. The only evidence tending to show that the appellee bank had any knowledge that the cattle were to be shipped was such an allegation in its original petition. This was sworn to by the cashier of the bank, Mr. Wright. In explanation of this he says that, upon learning of the allegation, he called Judge Lambert's attention to it, and that an amended petition, omitting the allegation, was filed. Wright testified positively, as did Elmore, that the appellee bank had no knowledge the cattle were to be shipped, and both say that the first knowledge the bank had of the shipment and sale of the cattle was when Elmore returned from Kansas City to Stella.

This is an action in equity brought to subject the proceeds of the cattle deposited in the appellant bank to the payment of the balance due to appellee. The appellee had judgment in the court below for the balance due on the Powers note and mortgage, which the appellant seeks to reverse in this court, contending that it had no notice of the appellee's mortgage, and no notice of any lien or of any trust in or upon the proceeds of the cattle deposited in its bank. From the record in this case it is undisputed that the appellant bank knew, when it took its mortgage from Elmore, that the cattle were mortgaged. Its officers say that Elmore told them of "a mortgage" or "one mortgage." It made no inquiry as to who held the mortgage incumbrance or the amount thereof; it made no effort whatever to ascertain the facts relative to the incumbrance; such information as it had would have put an ordinarily prudent man upon inquiry, which, if followed up, would have disclosed the mortgage indebtedness against the cattle. The law charged the bank with all the knowledge that it could have obtained had it made inquiry of Elmore as to the incumbrance on the cattle. Yet, the bank elected to take the mortgage without further investi-

gation or inquiry, which convinces us, as it undoubtedly did the trial court, that the appellant bank had notice of the purchase-price mortgages, or notice of facts sufficient to impute notice to it of the existence of those mortgages. When Elmore said, "Now, boys, these cattle have got to be settled for first," the bank knew he had not paid for the cattle, that he still owed for them, and that they were mortgaged for all or part of the purchase price; hence, no further inquiry by the bank. He was a customer of the bank; it knew his financial standing; knew whether or not he could purchase and pay for 50 head of cattle; knew whether the cattle were paid for or not; knew whether he could buy without giving security on the cattle. The bank knew, or could have known, the facts. If it did not know and failed to make inquiry, it should not now complain of want of knowledge. It accepted the mortgage more as a matter of form than as security. It had advanced, at previous times, money to Elmore before shipment for the same purpose. It relied, not upon its chattel mortgage, but upon Elmore. It had been assured that there would be sufficient money to pay the mortgage indebtedness from the cattle and the amount due the bank, and relied upon his statement then, as it had before. Had there been no slump in the cattle market, the cattle would have brought sufficient money to pay, not only Elmore's indebtedness to appellant bank, but also the purchase-price mortgages, and there would have been no lawsuit.

The bank having knowledge of these purchase-price mortgages, and having received the proceeds of the mortgaged cattle under an agreement with Elmore to first pay the mortgage debt against the cattle, made the bank a trustee of the proceeds for that purpose. While the legal title to the proceeds of the mortgaged cattle was in Elmore, the equitable title thereto, or so much thereof as was necessary to pay its mortgage, was in the appellee, and the appellant bank's application of a part thereof in liquidation of Elmore's indebtedness by his direction. be-

fore or at the time of application, leaving an insufficient amount to pay appellee's mortgage, would constitute no defense to an action in equity brought to subject this trust fund to the payment of that mortgage. The proceeds being sufficient to pay both purchase-price mortgages, the bank must restore so much of the trust fund as is necessary to pay the balance due the appellee. The relation of debtor and creditor existed only as to what money remained after the purchase-price mortgages had been paid. The record in this case brings it within the rule announced in *Alter v. Bank of Stockham*, 53 Neb. 223.

The judgment of the lower court is sustained by the evidence and is

AFFIRMED.