CARL ABELS ET AL., APPELLEES, v. C. R. BENNETT ET AL., APPELLANTS.

64 N. W. 2d 481

Filed May 21, 1954. No. 33542.

*Dryden, Jensen & Dier,* for appellants.

*Hamer, Tye & Worlock,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

The subject of this action is a deed alleged to have been executed and delivered for a valuable consideration by appellees in which C. R. Bennett is named as grantee and which by its terms conveyed to him an undivided one-half of the oil, gas, and other minerals in and under described land in Buffalo County owned by appellees. The object of the suit was to obtain an adjudication of invalidity of the deed and to quiet title of the land in appellees against all claims of appellants on the ground that the purported deed was secured by fraud and misrepresentation of L. R. Graham, undisclosed agent of C. R. Bennett, who conducted the transaction for the grantee. The findings of the district court were for appellees and a judgment was entered granting them the relief they sought.

Any interest of Laura O. Bennett in the subject matter of the case is limited to that which results from her

marital relationship with C. R. Bennett. It subsists or disappears according to the fate of her husband in the litigation. C. R. Bennett is designated herein as appellant, and L. R. Graham as Graham.

The claim of appellees, the owners of the land involved, is that about May 22, 1941, they gave an oil and gas lease thereon to Graham, and he filed and had it recorded in the office of the register of deeds of the county. He at the same time filed and had recorded in that office an instrument in writing purporting to be a mineral deed allegedly executed by appellees which by its terms conveyed to appellant one-half of the minerals in the land. This document is designated herein as the deed. The lease and deed each had attached a certificate of acknowledgment.

The appellees say the negotiations between them and Graham related only to an oil and gas lease and they did not at any time have any transaction with appellant or any person known to be acting for him. Appellees had no intention to sign a deed and knowingly only signed an oil and gas lease as the result of their negotiations and contact with Graham. If the deed had subscribed thereon the signatures of appellees they were obtained by Graham, the undisclosed agent of appellant, by fraud and misrepresentation. Appellees or either of them did not sign the deed knowingly and were not asked to acknowledge its execution and did not do so. They had no notice or knowledge of it or the recording of it until October 1952. The deed is a cloud on the title of appellees to the land. It damages them in their ownership and enjoyment of it. They have no adequate remedy at law.

Appellant denies the allegations of appellees except their ownership of the land subject to the rights of appellant as the owner of one-half of the minerals in the land by virtue of the deed; alleges the cause of action stated by appellees is barred by the statute of limitations, and they have been guilty of laches and are

estopped to deny the title of appellant by virtue of the deed; and asserts that appellant had no knowledge of the transaction concerning the execution of the deed and that he is an innocent purchaser for value of the interest in the land conveyed by the deed of appellees to him. Appellees deny the new matters alleged by appellant.

The proof conduces to show that: Carl Abels is a native of Germany. He came to the United States when he was about 10 years of age and attended school with considerable irregularity and repeated interruptions until he was about 19 years old. He learned the English language sufficiently to read and write it with some proficiency. He is a farmer and at the time important to the transaction under investigation lived on a quarter section of land owned by appellees since about 1920, 3 miles northwest of the village of Amherst. Emma Abels, his wife, is obviously limited in education and general experience. She attended school for some periods. Her comment was that they did not have schools when she was a young person like they have today "and I had to make my own way as far as I got." The school she attended was a small country school that had no grades, "it was just the first, second, third, and fourth readers." She can read and write to a limited extent.

Graham was a resident of Effingham, Illinois. He had been for about 15 years engaged in buying oil and gas leases and deeds representing mineral rights. Appellant resided in Tulsa, Oklahoma. He had been engaged in purchasing mineral rights. He would assemble small drilling blocks for the purpose of drilling. He did not desire mineral rights in a large compact acreage. He desired the tracts in which he acquired mineral rights to be separated. He had known Graham for about 15 years and had done business with him. In 1941 Graham heard "of an oil play going on in Nebraska." He contacted appellant in Tulsa, Oklahoma, concerning

his interest in acquiring minerals in Nebraska. Appellant was interested and it was arranged that Graham would go to Nebraska, investigate the situation, ascertain the price being paid in the area for minerals, and when this was done he would communicate the result to appellant. This he did. Appellant then told Graham he would like 2,000 or 3,000 acres in the areas in Nebraska where other companies were operating. It was understood that the mineral deeds would be in the name of appellant as grantee and Graham would file them for record. He thereafter on several occasions conferred with appellant by telephone while he was procuring deeds in Nebraska. It was a part of the method of operation that Graham would and he did take oil and gas leases on land in which he was named as lessee and a deed to appellant for a part of the minerals in the land.

Graham and an elderly man by the name of Clint Hamilton, a notary public employed by Graham to accompany him, strangers to appellees, on May 22, 1941, came to their farm home. Graham introduced himself to Carl Abels in the farmyard, stated his business as a purchaser of oil and gas leases, and solicited Carl Abels for such a lease on his land. Graham said the lease would be for 10 years if the yearly rental was paid and that any time the rental was not paid the lease would terminate. The three of them went into the house where Mrs. Abels was. She was introduced to Graham. He repeated in her presence what he had told her husband. He did not say anything, according to appellees, about purchasing a deed of any part of the minerals in the land. The conversation concerned only an oil and gas lease for not to exceed 10 years and to terminate at any time the payment of rental according to the lease was in default. Appellees decided to give that kind of a lease to Graham. This was the first experience appellees had with a transaction of this character. There were things stated by Graham they did not understand. He did some

writing on a typewrier he had with him and when he finished he had papers he directed appellees to sign. They were laid on a table with the place of signature of only one of them exposed and when it was signed it was turned back and the next one was signed. This process was repeated until the signatures were attached to all of them. How many instruments appellees signed they did not know. They were not offered the privilege of examining or reading the papers before they signed them or while Graham was there. He took them, gave appellees copies of some papers which they thought were an oil and gas lease, and matters incident to it, and two checks. Appellees were not asked to and did not acknowledge their execution of anything they had signed. Hamilton was not introduced to them. He said nothing and had no part in the transaction. Carl Abels thought he was probably the father of Graham. There was written on one of the checks "for - ½ royalty," and the check was deposited in the bank about 4 days later. Appellees did not see this and would not have understood its meaning if they had. A receipt they signed contained this: "for ½ royalty sold to C. R. Bennett." They did not read the receipt or know its contents. The copies of documents left with appellees were folded or rolled up, were not examined or read, and were placed in a box in the house and retained for more than a year. Their contents were not known to appellees. Some time after the next installment of rental became due and had not been paid the copies were destroyed because of the belief that the oil and gas lease had terminated.

Appellees had no transaction involving the title to the land described in the deed and did not make or have made any examination of the record title of the land from the date of the deed until about October 15, 1952. They received information about the date last stated that the record title of the land in the office of the register of deeds exhibited the deed in question. This developed from the fact that they at that time made

a second oil and gas lease on the land and the party who received it examined the records in the office of the register of deeds and there found the record of the deed. He informed appellees what he had learned from the record and they claimed that it was the first information they had that Graham had secured their signatures to a deed.

Appellant produced the testimony of Graham. He said that before the deed was executed he gave to each of the appellees a form of oil and gas lease and a form of mineral deed for their examination, and that he explained to them in detail the contents and meaning of each and what he desired to purchase from them. Appellees discussed the matter between themselves and decided to give a lease and mineral deed. A lease and a deed were prepared in duplicate and when completed were given to appellees to examine before either of them was signed. Two checks and two receipts were written and examined by appellees. The lease, the deed, and the receipts were then signed and the execution of the lease and deed was formally acknowledged. Copies of the lease and the deed were given to and left with them and the checks were delivered to them.

The period of limitation within which an action for relief on the ground of fraud may be brought is 4 years. The time of the accrual of such a cause of action is fixed by statute as the time of the discovery of the fraud. § 25-207, R. R. S. 1943. This court said concerning this subject in Rucker v. Ward, 131 Neb. 25, 267 N. W. 191: " 'An action for relief on the ground of fraud must be commenced within four years after the discovery of the facts constituting the fraud, or of facts sufficient to put a person of ordinary intelligence and prudence on an inquiry which, if pursued, would lead to such discovery.' " See, also, Burchmore v. Byllesby & Co., 140 Neb. 603, 1 N. W. 2d 327. This case requires a determination of the time appellees discovered the fraud relied upon by them as the basis of the relief they seek. The deed

was made May 22, 1941. This case was commenced May 28, 1953. The requirement is that if more than 4 years have elapsed since the alleged fraud the victim of it must allege and prove facts as to the failure to discover it which entitles him to maintain an action by virtue of the fraud, notwithstanding the lapse of time, and he must allege and establish diligence in this regard. Baxter v. National Mtg. Loan Co., 128 Neb. 537, 259 N. W. 630; Coad v Dorsey, 96 Neb. 612, 148 N. W. 155; State Bank of Pender v. Frey, 3 Neb. (Unoff.) 83, 91 N. W. 239. The deed was filed for record in the office of the register of deeds June 2, 1941. It was said many years ago that fraud is discovered when the fraudulent deed is recorded. Gillespie v. Cooper, 36 Neb. 775, 55 N. W. 302. That case in this respect was repudiated and disproved. Jones v. Danforth, 71 Neb. 722, 99 N. W. 495. The placing of a fraudulent deed upon the public deed records is a fact to be considered in deciding when the fraud was discovered and if the deed is accompanied with circumstances sufficient to put a person of ordinary intelligence and prudence upon inquiry which if pursued would lead to the discovery of the fraud, the statute begins to run from the recording of the deed. Sweley v. Fox, 135 Neb. 780, 284 N. W. 318; Jones v. Danforth, *supra;* Forsyth v. Easterday, 63 Neb. 887, 89 N. W. 407; Annotations, 76 A. L. R. 869, 137 A. L. R. 283.

Appellees had in their exclusive possession and control from the completion of the transaction with Graham on May 22, 1941, for more than a year a copy of the lease and a copy of the deed. The deed plainly stated that appellees had sold, conveyed, and delivered to C. R. Bennett "an undivided One Half (½) - - - interest in and to all of the oil, gas and other minerals in and under" the land owned by appellees. The receipt for the amount paid to appellees for the deed recited "Sixteen Dollars in full for ½ royalty sold to C. R. Bennett this day on my farm of 160 acres." The check for the royalty was payable to appellees. There was written on its face

near the lower left-hand corner "for - ½ royalty." Appellees had it for at least 4 days. They each endorsed it and it was deposited and cleared. Appellees could both read and they each stated they knew what a deed was and what a lease was, and that they each knew that any writing should not be signed without reading it or otherwise knowing its contents.

If a fraud ought to and would have been discovered if reasonable diligence had been exercised by the alleged victim of it the statute runs from the time such discovery ought to have been made. A litigant cannot excuse delay in instituting a suit on his cause of action if his failure to discover the fraud is attributable to his neglect. A party defrauded must be diligent and prudent in making inquiry and investigation. Means of knowledge in the possession and control of the injured party are equivalent to knowledge. In Coad v. Dorsey, *supra,* it is said: "A party seeking to avoid the bar of the statute on account of fraud must aver and show that he used due diligence to detect it, and, if he had the means of discovery in his power, he will be held to have known it. Wood v. Carpenter, 101 U. S. 135." See, also, Hollenbeck v. Guardian Nat. Life Ins. Co., 144 Neb. 684, 14 N. W. 2d 330; Gillespie v. Cooper, *supra;* 34 Am. Jur., Limitation of Actions, § 167, p. 134; 54 C. J. S., Limitations of Actions, § 189, p. 188.

In granting relief on the ground of fraud the foundation principle of courts of equity was that the party defrauded was not affected by lapse of time so long as he remained, without any fault of his own, in ignorance of fraud that had been committed. However, equity aided the diligent and not the negligent. It disliked stale claims and would not permit a party to prolong by his laches the time during which he might apply for relief. Hence the doctrine was that the means of knowledge were equivalent to actual knowledge. The statute and the decisions of this court are consistent with the doctrine of the courts of equity. Appellees by the exercise of the

least diligence and prudence on or after May 22, 1941, for more than a year, could have had from documents in their possession all the information they secured in October 1952, concerning the result of the transaction they had with Graham and the deed involved herein. They had the means in their possession of actual knowledge and they were not entitled to an extended time within which to bring their action. The statute of limitations is a complete defense in this case.

The judgment should be and it is reversed and the cause is remanded to the district court for Buffalo County with directions to dismiss this case.

REVERSED AND REMANDED WITH DIRECTIONS.