Louis R. Boettcher, appellant, v. Robert L. Goethe, appellee, revived in the names of Ida U. Goethe and the Omaha National Bank, Executors of the Estate of Robert L. Goethe, deceased, appellees.

85 N. W. 2d 884

Filed November 8, 1957. No. 34179.

*Shrout & Brown* and *McCulloch, Leigh & Koukol,* for appellant.

*Fitzgerald, Hamer, Brown & Leahy,* for appellees.

Heard before Simmons, C. J., Carter, Messmore, Chappell, Wenke, and Boslaugh, JJ.

Boslaugh, J.

The recovery of damages because of alleged fraudu-

lent representations made by Robert L. Goethe to appellant to induce him and which did induce him to enter into a contract with Robert L. Goethe for the purchase by appellant of the stock of Charles E. Walters Company, a corporation authorized to do business in the State of Nebraska, is the relief sought in this litigation. At the conclusion of the evidence offered by appellant in his case-in-chief Robert L. Goethe moved the court to dismiss the case because of insufficiency of the evidence to sustain a verdict for the appellant. The motion was sustained and a judgment of dismissal of the cause was rendered. The motion of appellant for a new trial was denied and he prosecutes this appeal.

Charles E. Walters Company, an Iowa corporation doing business in Nebraska with its principal place of business in Omaha, was a defendant. Its general demurrer to the amended petition of appellant was sustained and the case as to it was abandoned. Robert L. Goethe died after the appeal was docketed and by stipulation of the interested parties it was revived in the names of Ida U. Goethe and the Omaha National Bank as the executors of the estate of Robert L. Goethe, deceased. The designation of appellee as used herein refers to Robert L. Goethe who was a party to the negotiations and contract had and made with appellant which are important to this case.

The appeal presents an issue as to the sufficiency of the evidence to sustain a verdict for appellant. If it does, the cause should not have been dismissed by the trial court and the judgment rendered must be reversed. If it does not, the judgment is correct and should be approved. The proof from which this must be concluded is without conflict. It was produced by appellant and he is entitled to have it and any reasonable inferences deducible therefrom considered most favorably to him. Born v. Estate of Matzner, 159 Neb. 169, 65 N. W. 2d 593. It is in this manner that the record is examined and the issue resolved.

The record contains proof of the following:

Appellant was a graduate of high school at 16 years of age and was on the honor roll of the school on two occasions. His attendance at the University of Omaha was interrupted by military service in the last World War. He was released from that engagement in September 1945 and returned to the University of Omaha to complete the requirements and obtain a degree in business administration. His study and instruction largely concerned economics, investments, and accounting. His experience in the university continued for 13 or 14 semesters and he accumulated more than sufficient credits to entitle him to a degree in business administration. He testified at the trial that he was deprived of a degree because he failed in the math course at one time but he said at an earlier time when his deposition was taken that he did not get a degree because of an oversight in taking one of the required courses and not because he failed to pass in any course. He attended the university after his engagement in military service one year, one summer school session, and two additional semesters.

He was employed after he concluded his university attendance by Central Republic Company of Omaha which was operating an investment business dealing in and selling stocks, bonds, and securities. His duties were largely clerical including writing up the Dow-Jones averages and he remained with that company 6 or 8 months. He later was employed from October 1947 to April 1948 by Fitzgerald & Company in South Omaha. He promoted their insurance business. Appellant was a stockholder, cashier, and director of Nodaway Valley National Bank of Villisca, Iowa, during the period from April 1, 1948, to August 17, 1951. He owned one-half of 51 percent of the stock of the bank and Walter Hyink owned the other half of the 51 percent of the stock. Charles E. Walters Company as a broker acting by appellee, manager of the company, assisted

the appellant and Walter Hyink, hereafter referred to as Hyink, in finding and buying the bank stock in March or April of 1948. During the time from April 1, 1948, to August 17, 1951, a period of more than 3 years, appellant saw appellee on three occasions, twice when he stopped at the bank to say "hello" and once when appellant visited with appellee at the bankers convention in Des Moines.

There was a controversy between appellant and Hyink in October of 1950, the nature and reason of which does not appear in the record because appellant could not remember the cause or subject matter of it. He conferred and corresponded with appellee concerning the sale of his stock in the bank. The disagreement was of a character that appellant entertained the idea of disposing of his stock in the bank and this was his reason for communicating with appellee during October of 1950. Appellee counseled appellant not to dispose of his stock but to otherwise resolve his disagreement with Hyink. He accepted and followed this suggestion. However, there was an additional disagreement of appellant and Hyink in December of 1950 concerning policy of the bank. It related to bonuses to officers and specifically to appellant. He was not satisfied with a salary increase because it could not be made to apply to the preceding year. This lack of harmony continued until Hyink and appellant contemplated an arrangement whereby one of them would buy the stock of the other. Hyink, disregarding the agreement that both of them would confer with appellee at the same time, solicited appellee for assistance in reference to the problem. Appellee advised appellant at once that he had been approached by Hyink. Appellant testified on the trial of this case that he had not determined to end his relationship with Hyink before he conferred with appellee on July 27 or August 2 or that he was serious about leaving Villisca at that time. He admitted that he had testified at an earlier time in a deposition that when

appellee really realized that he was serious in wanting to get out (of the bank and the town of Villisca), "* * *. we (appellant and appellee) started discussing the possibility of my (appellant) joining the Charles E. Walters Company." He further testified in the deposition: "Question: Now, was this before you had concluded definitely to sell your interest (in the bank), or was it as you said a minute ago, after he (appellee) learned that you were serious about getting out of the bank at Villisca? Answer: I think that's the proper way to state it; we entered into negotiations, or discussed it more seriously after Mr. Goethe knew that I wasn't going to stay in the bank at Villisca. Question: It came about then really more in the way of your future as to what you would do as distinguished from your decision to make the sale, is that true? Answer: Well, you are making kind of a fine point there, but I would agree on that, yes."

It was testified by appellant at the trial that he talked with appellee concerning the investment of the funds that appellant would receive because of the sale of his bank stock to Hyink and admitted that appellee made an effort to have appellant purchase other bank stock but appellant evinced no interest in doing so. He was shown and had opportunity to examine the prospectuses of several banks which appellee was offering for sale including a bank in Aurora, Nebraska. This preceded any inquiry by appellee as to whether appellant could be interested in joining the Charles E. Walters Company or purchasing stock of that company.

It was agreed by appellant and appellee at the commencement of their conversations concerning the Charles E. Walters Company and the possible purchase by appellant of the stock of the company owned by appellee and his family that before any specific or binding obligation would arise their agreement would be put in writing and executed by them.

A complete and comprehensive written contract was

prepared by or at the instance of appellee in which he, acting for himself and as agent of all other stockholders of the Charles E. Walters Company, was designated as seller and appellant as buyer. It provided that appellee would sell the entire capital stock of the company, consisting of 500 shares, to appellant who would purchase it for $100,000 and pay to the seller one-fourth thereof at the time of the execution of the contract, payment of which was acknowledged by recitation in the contract. The balance of $75,000 was to be paid from the income of appellant consisting of salary, percentage of his production, interest on his investment, and participation in gross income of the company as specified and limited in the contract. Appellant was not to have the stock, any voting rights, or dividends thereon until the full purchase price was paid except as otherwise provided in the contract but in lieu of dividends he was to be paid by the seller 5 percent annual interest, payable semiannually, on his investment from year to year until the purchase price was fully satisfied at which time the stock and full control and operation of the company would be surrendered to and vested in appellant. The buyer was to devote his time and efforts to the conduct of the business of the company and was to be paid, until the purchase price was satisfied, $5,000 the first year, $6,000 each year thereafter, a percent of the amount of his production or contribution to the total income of the company, and a percent of the gross commissions and fees collected by the company as provided in the contract. He was also to be paid his traveling expenses including 6½ cents per mile for the use of his automobile. The company was obligated to pay for 3 years the premiums on $25,000 of life insurance on the life of the buyer to be represented by a policy of the 5-year convertible plan with the wife of appellant as beneficiary. It was provided that if the seller died before August 15, 1952, the purchase price was reduced to the amount the buyer had paid the seller at the time of his death;

if he died after that date and before August 15, 1953, it was reduced one-half or to $50,000; if the seller died after August 15, 1953, and before August 15, 1954, the purchase price was to be $75,000; and if he died after August 15, 1954, it was the full $100,000. The seller had the option to waive further payments by the buyer and assign and deliver the stock and control of the company to him in which event the contract should be completely performed. Likewise the seller had an option at any time within 3 years from the date of the contract, if he decided the buyer was not adapted to the duties and responsibilities assumed by him and did not give promise of qualifying to insure the mutual benefits contemplated, to refund to the buyer the amount of the purchase price he had paid to the time of the election to exercise the option less the amount of interest and participating benefits received by the buyer, to terminate the contract, and to end all rights and obligations by virtue of it. The draft of the contract was presented to and it was examined by appellant. On August 24, 1951, it was executed by the parties thereto and delivered in the sense and with the intention that it was and should be an effective, binding contract.

In the negotiatons appellee was asked by appellant the price of the stock and appellee answered $100,000. That is all that was said on that subject. It was discussed that a cash initial payment of $25,000 of the purchase price would be expected and the payment of that amount was made by appellant the day the contract was executed and delivered. The contract provided and appellant intended to satisfy the unpaid part of the purchase price by the application thereto of his future earnings, commissions, and interest income. He so testified and this is confirmed by the accounting statements of the company prepared to evidence the earnings and commissions. These were made and exhibited to appellant. Each is signed by him without any showing of objection or protest. He made and accepted settlement on the

basis of the statements and he has retained what was due him according to them.

The contract was acted upon from the time it was made until October 3, 1953, without change or modification except a verbal understanding that the amount equal to the federal income tax on the interest paid and the commissions earned by appellant would not be applied to complete payment for the stock purchased but could be used by him to discharge his income tax liability. The contract prepared and submitted to appellant for examination had a blank space to insert in it the rate of interest to be paid by the company to appellant upon the investments made by him including the initial payment of $25,000 and a blank space to insert therein the mileage to be paid appellant for the use of his automobile while he was traveling on the business of the company. These were filled in by appellee in the presence and with the knowledge and acquiescence of appellant immediately before the contract was executed and delivered. In the space for the rate of interest "5" was inserted and in the space for the mileage allowance "6½" was inserted. Appellant testified that his father told him the evening of the day the written contract was made that appellant had made a bad bargain and that he, his father, would never have entered into such a contract. Appellant made no effort to prevent payment of his check of $25,000 given to appellee that day which was not paid by the bank for 4 days thereafter or on August 28, 1951.

Appellant read the contract, knew its contents, and knew that it expressly contained each and all of the provisions he attempts now to assail as different than his understanding of statements made in conversations and negotiations preceding the making and delivery of the contract. He took a copy of the contract with him the day it was executed. The seller performed the contract to the time when appellant abandoned it and attempted to rescind it.

There was no personal production by appellant for the 6-month period preceding February 15, 1953. This means that he did not sell any bank stock or arrange any sales as a broker upon which he earned commission for that period. He had by his efforts during the preceding 6-month period been responsible for the company earning an amount in excess of $17,000. In the third 6-month period he was with the company his efforts produced commissions of $2,450. From August 15, 1953, to October 3, 1953, he made sales and earned on account thereof for the company approximately $20,000 and was the recipient of his share thereof according to the contract.

Appellant testified he concluded he made a bad bargain and since that time he had been trying various ways and means to avoid his contract. He consulted and employed attorneys in the summer of 1953, and requested appellee to talk with one of them about August 15, 1953, after a settlement of commissions was made. The attorneys at the direction of appellant wrote a letter on October 2, 1953, and sent it to appellee by registered mail to the office of the Charles E. Walters Company. Appellant was in the office October 3, 1953, when the letter was delivered. He saw it and told the secretary of appellee to deliver it unopened to appellee. Appellant knew generally what was in the letter. He had mentioned his intention of withdrawing from his connection with the company but had indicated no time or date. On October 3, 1953, he was a party to plans for him and his wife to attend a bankers convention in Des Moines, Iowa, with appellee shortly thereafter. Appellant left the office of the company the day the letter of the attorneys was delivered. He did not see or talk with appellee. He did not return to the office. He called appellee by telephone a few days thereafter and told him that appellant was sorry he did not have an opportunity to discuss the matter with appellee. Appellant testified that he at no time had any bitterness or anger toward appellee. It appears in the testimony of ap-

pellant in one of the depositions he gave that he was certain that appellee never lied to appellant in any way or ever misrepresented any facts to him.

Appellee disclosed to appellant during the negotiations that he owned only a part of the stock of the company, that his daughters owned the balance thereof, and that appellee had a power of attorney to represent and act for them. Appellant said that he knew who the stockholders were before the contract was prepared and entered into. A recitation of the contract is that the capital stock of the company was 500 shares of the par value of $50 per share, that appellee owned 150 shares, and that he was authorized to act for the other stockholders. The books and records of the company, including copies of its income tax returns for a period of 2 or 3 years, were on August 2, 1951, made available to appellant and he made such examination of them as he desired. He testified that they were genuine, proper, and accurate and that he was not presented any fictitious figures, books, or records. It was admitted by appellant that after he left the company he told Harry E. Ross, president of the City National Bank of Shenandoah, Iowa, that the reason he withdrew from the company was because his wife objected to his traveling so much which his work for the Charles E. Walters Company required.

The letter of October 2, 1953, written on behalf of appellant to appellee says that appellant had elected to rescind the contract on the ground and for the reason that under it appellee failed, neglected, and refused to give appellant the training and education necessary to permit him to pay out the contract. Appellant thereafter instituted an action against appellee for the rescission of the contract. Subsequently that action was dismissed by appellant. Eventually this action was commenced for damages because of the claim of fraudulent misrepresentation.

Appellant now asserts that he was forced to sign the

contract dated August 24, 1951, although, as he says, its terms were read and understood by him and they were different than the statements made during the negotiations preliminary to the written contract, because of commitments he made after the sale of his bank stock on August 17, 1951. He admits that he previously testified that he had determined to leave Villisca, Iowa, sometime in July 1951.

It is argued by appellant that the contract because of which this litigation resulted is intrinsically fraudulent. He says appellee could not have performed by delivering all of the shares of the stock of the company and appellant could not have enforced the contract in the event of the death of appellee because he owned only 150 of the 500 shares of the stock of the company and the other stockholders were not named in and did not sign the contract. The contract recites that appellee, referred to as seller, was acting for himself and as agent for all other stockholders of the Charles E. Walters Company. Another part of the contract says that the capital stock of the company is 500 shares, that the seller is the owner of 150 shares, and that he is authorized to act for the other stockholders who own the balance of 350 shares. The identity of all the stockholders was made known to appellant during the negotiations preliminary to the making of the contract and any stock transfer subsequently was disclosed to appellant. Appellee advised appellant that he was authorized to sell all the stock and that his authority was evidenced by power of attorney. The power of appellee to bind the stockholders was expressly given and the act of appellee in making the contract was later ratified by them because of what was subsequently done in which they acquiesced and participated. Appellant seems to have a unique theory that the stockholders, other than appellee, would be obligated if their names appeared in the contract or as signatories over the name of appellee but would not be obligated otherwise notwithstanding their obvious

intention to be bound. The law in this jurisdiction, and quite generally, is that a disclosed or undisclosed principal is obligated by an authorized simple contract made only in the name of the agent if it was the manifest intention of the agent and the third party to obligate the principal as well as the agent. This court said in Lincoln Joint Stock Land Bank v. Bexten, 125 Neb. 310, 250 N. W. 84: "Except as to the execution of negotiable instruments and obligations under seal, an undisclosed principal is bound by simple contracts made by the agent, when the acts done by the agent are within the scope of his authority and in the course of his employment." See, also, Bankers Surety Co. v. Willow Springs Beverage Co., 104 Neb. 173, 176 N. W. 82; Lincoln Joint Stock Land Bank v. Bexten, 129 Neb. 422, 261 N. W. 845; Restatement, Agency, § 149, p. 379; 2 Am. Jur., Agency, § 394, p. 308; 3 C. J. S., Agency, § 241, p. 162. The argument of appellant in this respect cannot be sustained.

The substance of the recitations of the contract in part is: (1) That the person whose name the company bears organized the business of selling banks without publicity, that the company is a pioneer in the business and has served bankers for more than 46 years, that it enjoys an enviable reputation where known, and that its stock has a substantial good-will value; and (2) that the nature of the business requires special training to qualify an individual to operate successfully and profitably, that the greater the experience of an officer or employee, the more valuable his services are to the company and the more valuable to such officer or employee is the ownership of the stock of the company, and that the purchase price of the stock is not based upon tangible values but upon earning capacity of the company and the benefits to be enjoyed by the owner and operator of it. Appellant characterizes these as false solely because of the amount of his earnings during the rather brief time he was connected with the com-

pany. This is not a convincing deduction. The pleading of appellant does not charge that these were false or misleading and no attempt was made during the trial to establish that they were false. The truth of them finds some support in the proof submitted by appellant. It shows that during the year 1952 the income of the company was in excess of $67,000 even though appellant did not produce a single cent of that income during the last half of the year. The mere characterization of these recitations as false does not condemn them or assist appellant. There are similar comments and conclusions by appellant concerning other portions of the contract. The weakness of them is that in each instance there is a lack of evidential integrity. It is appropriate to observe in this connection that appellant, with the assistance of counsel and extended opportunity for an appraisal of the entire situation, did not consider that the contract was faulty or that it contained a means of escape from its obligations because of any of the reasons for which it is now assailed by the arguments made in the respects referred to in the foregoing. If any of these had been considered as important factors, they or some of them would naturally have been included in the letter prepared and transmitted by counsel for appellant as reasons for the rescission of the contract. The appellant at that time, by his sworn admissions, was motivated by a desire and determination to discern some way or means to avoid his contract obligations. These matters now emphasize why any of them were not assigned for the conclusion and action of appellant. It is significant that fraud, misrepresentation, concealment, or deception are not mentioned in the letter of October 2, 1953, as a reason or ground for rescission or for any purpose. If appellant had been deceived or defrauded, he knew it then and it is unbelievable that he would not have proclaimed it as a basis of terminating the effectiveness and burdens of the contract. The letter was written more than 2 years after the contract was

made. Appellant had concluded he had made a bad bargain and he was seeking ways and means to avoid any obligation because of the contract. He then knew all the facts. He employed and consulted counsel in the summer of 1953. By the letter he gave notice that he had rescinded the contract and freed himself from its very considerable burdens for a single reason: "* * * on the ground and for the reason that under this contract you (appellee) have failed, neglected and refused to give him (appellant) the training and education necessary to permit him to pay out said contract in accordance with the provisions set forth in the contract to his damage." Appellant then knew that he had a valid contract and he sought to rescind it because there had been a material breach in the performance of a condition subsequent by appellee. The first action instituted by appellant recognized that it was a valid contract. It sought to have a court of equity rescind it for breach of condition subsequent. It was consistent with the reason assigned for the attempted rescission in the letter written to appellee. This is convincing that what appellant did was deliberately and knowingly done. There was a deposition of appellant taken in that case in which he testified that appellee never misrepresented any facts to him or lied to him in any way. Appellant has never attempted to testify that he learned any additional or new fact after October 2, 1953, of importance in this respect. He, under these circumstances which are established by uncontroverted evidence, is estopped to assert fraud as a basis of relief. The rule is venerable in this jurisdiction that a litigant is not permitted to take inconsistent positions and pursue them to the detriment of his adversary. The latest expression of this doctrine by this court is in O'Neil v. Union Nat. Life Ins. Co., 162 Neb. 284, 75 N. W. 2d 739: "It is a well-settled rule in this jurisdiction that where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after liti-

gation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold."

It is asserted by appellant that a confidential relationship existed between the parties at the time the contract of August 24, 1951, was made. The prior relationship between the parties was a single instance when appellee, representing the Charles E. Walters Company, acted as a broker shortly before April 1, 1948, in the sale of bank stock to appellant and Hyink. There was no other business matter in which the parties to the contract were interested until the services of appellee were solicited in the sale of the bank stock of appellant to Hyink. In this matter appellee was first contacted by Hyink. About 3½ years elapsed between these transactions and during that time appellant saw appellee briefly three times in the most incidental manner and the evidence fails to show that any subject was discussed or considered. There is absence of proof of reason or opportunity for appellant to have developed trust and confidence in appellee or for him to conclude that such a relationship existed at the time the negotiations for the sale of the stock of the Walters Company were initiated. The facts disprove justification of such conclusions. Appellant had several meetings with appellee, took time for deliberation of the proposal, and had opportunity for disinterested consultation before he decided to buy the stock. He and appellee agreed at the threshhold of the conversations that the terms of purchase discussed by them should not be final or binding until a written contract was prepared and executed by both parties. This kind of procedure and precaution is foreign and abhorrent to a relationship of confidence and trust. Appellee did not purport or attempt to act concerning the sale of the stock of the company in the interest of appellant. He was claiming to act and did act as owner in his interest and in the interest of the other stockholders of the company who were properly and

definitely concerned to secure as large a price as was fairly possible for the stock. It was not established in this case that a confidential relationship existed between the parties at any time. Generally, it may be said that such a relationship exists between two persons if one has gained the confidence of the other and purports to act or advise with the other's interest in mind. Restatement, Restitution, § 166, Comment d, p. 676; Popejoy v. Eastburn, 241 Iowa 747, 41 N. W. 2d 764; Thorne v. Reiser, 245 Iowa 123, 60 N. W. 2d 784; In re McDonnell's Estate, 65 Ariz. 248, 179 P. 2d 238; Harrison v. Welsh, 295 Pa. 501, 145 A. 507. The term confidential relation has a comprehensive meaning and it may vary in reference to particular relationships involved, but it has not been construed to include the relationship of vendor and vendee merely because the parties had known each other for a limited time and both parties were favorably impressed with the other.

Appellant claims that appellee falsely represented the value of the Charles E. Walters Company, the method of paying the purchase price of the stock sold to him, the mileage allowance for the use of his automobile in the business of the company, the rate of interest to be paid appellant on the amount he invested, the expected income to be realized by him, and the insurance program for him.

There was no representation as to the value of the company or its stock. The record is that appellant asked appellee at the beginning of their negotiations the price of the stock and he said it was $100,000. There was nothing further said about it. Appellant knew from the beginning the price was that amount and he could not have been deceived concerning it. The statement of appellee as to the price of the stock was the amount asked for an item of property which he and his family owned and were offering for sale. It did not amount to a representation as to value. In Hooning v. Henry, 106 Or. 605, 213 P. 139, the court said: "We find no

case in which the mere asking of a price for an article is construed as a representation as to its value. Every man has the right to ask any price he sees fit for the wares he has to sell and the matter of fixing the price may be predicated upon the supposed usefulness of the article or some sentimental value that the party may place upon it, or what he thinks he can get for it from a prospective purchaser." See, also, 37 C. J. S., Fraud, § 57c, p. 343.

The contention concerning the method of payment of the balance of the purchase price is equally untenable. The contract contains provisions which conform precisely to the testimony of appellant as to the manner of paying the purchase price after the cash installment of $25,000 was paid. The contract does not require payment of the balance within any period or by payment of certain amounts at specified times. Payments to be made are on the basis of the earnings of appellant in excess of his base salary as determined in part by his production of commissions and a percentage of the total income of the company in excess of a stated amount. Appellant knew this when he executed the contract and he testified that he always expected to pay the $100,000 for the stock as the contract provides unless the price was reduced by the terms thereof in the event of the death of appellee.

Appellant claims he was defrauded because he says appellee told him that he would be making an income of $20,000 per year at the end of 3 years. This statement was obviously and inherently a prediction. It just had to be understood by appellant to be that. He did not continue with the company for the 3 years referred to and he did not apply himself efficiently to its interests at all times while he was employed. There is no proof of bad faith on the part of appellee in this regard and the most that he could be blamed for was that he overestimated the ability of appellant to earn an income of that amount. It was not a false representation. In

Cook Livestock Co., Inc. v. Reisig, 161 Neb. 640, 74 N. W. 2d 370, this court referred to the elements of fraud including the one that a representation to be fraudulent must be made either with knowledge of falsity or without such knowledge as a positive statement of known fact and continued: "In addition to the above, the general rule * * * is that fraud must relate to a present or preexisting fact, and cannot ordinarily be predicated on representations or statements which involve mere matters of futurity or things to be done or performed in the future. * * * It is a general rule that fraud must relate to a present or preexisting fact, and cannot be ordinarily predicated on unfulfilled promises or statements as to future events. * * * False representations, in order to found an action in the nature of deceit, must not consist merely of promises to be performed in the future, and generally not merely of expressions of opinion by a vendor as to the quality of his goods. They must be representations of known existing facts."

The remaining representations said by appellant to be fraudulent concern the mileage allowance for the use of his automobile, the number of years the premium on the insurance policy on his life should be paid by the company, and the rate of interest to be paid on his investment. These were not representations but they, according to appellant, were verbal agreements talked of during the negotiations preliminary to and before the contract was prepared and executed. The testimony could not in the situation of this case make an issue of fact or support a verdict for him because of these matters if a verdict had been obtained. Any conversation about these matters was merged in and foreclosed by the written contract and parol evidence concerning them was incompetent. The provisions of the written contract include all of the matters complained of by appellant to which reference has been made above except the single statement that he would have an income

of $20,000 in 3 years. Appellant examined, read, and understood the contract. He afterwards executed it. It was delivered, became effective, and the parties operated under and had the benefit of it for more than 2 years. Their rights and obligations were fixed by and must be determined according to their written contract. Bitler v. Terri Lee, Inc., 163 Neb. 833, 81 N. W. 2d 318; Hafeman v. Gem Oil Co., 163 Neb. 438, 80 N. W. 2d 139; Hansen v. E. L. Bruce Co., 162 Neb. 759, 77 N. W. 2d 458.

The judgment of the district court should be and it is affirmed.

AFFIRMED.

YEAGER, J., participating on briefs.