EVELYN NATHAN, APPELLANT, V. BERNARD M. McKERNAN
ET AL., APPELLEES.

101 N. W. 2d 756

Filed March 11, 1960.   No. 34558.

*Paul I. Manhart,* for appellant.

*Shrout & Brown, Collins & Collins, Abrahams & Kaslow, Finlayson, McKie & Kuhns, Francis A. McLane,* and *Garrotto, Doerr & Nanfito,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

On March 2, 1956, plaintiff, Evelyn Nathan, filed a petition in the district court for Douglas County against defendant Bernard M. McKernan, his wife Margaret A. McKernan, and other named defendants, seeking foreclosure of a second mortgage alleged to have been duly executed and delivered to plaintiff by defendants McKernan on described real estate owned by them in Douglas County, the consideration for which was allegedly the sale by plaintiff to said defendants of a York-type locker plant in Bellevue, Nebraska. The

mortgage, dated November 14, 1951, was allegedly given to secure a promissory note of even date for $8,499, payable in nine annual installments of $850 each with interest at 4 percent commencing December 1, 1952, plus one final payment of $849 with interest at 4 percent on December 1, 1961. Both the note and mortgage, and also the bill of sale to the plant, executed by the parties and delivered to said defendants, contained an acceleration clause. Plaintiff alleged that no part of the principle and interest on the note and mortgage had been paid by defendants McKernan and that $8,499 with interest at 4 percent from November 14, 1951, plus $108 which plaintiff was obligated to and did expend to insure the mortgaged property in order to protect her interests, was due and payable to plaintiff by said defendants.

Admittedly, the real property was subject to a first mortgage in favor of defendant Packers National Bank, and defendant Gerald Nathan had a judgment lien which was prior to plaintiff's second mortgage. Admittedly, all other named defendants each had either a mortgage lien or a judgment lien on the property, each of which were allegedly junior and inferior to plaintiff's mortgage. Plaintiff sought to have defendants, other than defendants McKernan, set forth their respective liens, and prayed that defendants be foreclosed of all equity of redemption or other interest in said mortgaged premises, which should be sold according to law; that plaintiff should be adjudged the amount due her on said note and mortgage; and that she should be awarded a deficiency judgment against defendants McKernan for any amount thereof which remains unpaid upon applying the proceeds of the sale to the liens according to their determined priority, and equitable relief. In that connection, admittedly the judgment lien of defendant First National Bank of Omaha, of which defendant United States of America was assignee, and the judgment lien of defendant John M. Messner, had thereto-

fore been paid and satisfied in full. Also, plaintiff alleged that defendant C. A. Jenks, assignee, had a judgment against defendants McKernan and that said judgment was a lien on their real property for $64 costs and interest, which was junior and inferior to plaintiff's mortgage, but that the amount unpaid on said judgment was unknown. In that connection, defendant C. A. Jenks filed no pleadings and the trial court made no determination with regard to said lien, and no complaint is made here with regard thereto.

Defendant Packers National Bank filed an answer and cross-petition denying generally, except that after describing a note and mortgage on defendants' real property allegedly executed and delivered by defendants McKernan on March 10, 1947, and duly recorded, said defendant alleged that defendants McKernan were in default of certain payments as required; alleged that the whole amount unpaid was due and owing as provided by the acceleration clause of said mortgage; and prayed for foreclosure of said mortgage as a first lien, and for general equitable relief.

Defendant Gerald Nathan, assignee, filed an answer and cross-petition describing an unpaid judgment against defendant Bernard M. McKernan of which defendant Gerald Nathan was assignee. He alleged that said judgment was a second lien on defendants' real property, and prayed that upon a marshalling of liens, there should be a foreclosure of all equity of redemption or other interest in said property, which should be sold according to law; that out of the proceeds he should be paid the amount of his judgment, interests, and costs; and that if there was any deficiency, he should be given judgment therefor against defendant Bernard M. McKernan, and equitable relief.

Defendant Midwest Packing Company filed an answer and cross-petition denying generally, except that after describing a note and mortgage on defendants McKernans' real property allegedly executed and delivered

by them on February 15, 1952, and duly recorded, said company alleged that no part thereof had been paid and said defendants were in default; and prayed for an accounting of the amount due; foreclosure of said mortgage, and equitable relief.

Admittedly, one John Brinjak, doing business as Town and Country Heating Company, filed a petition in intervention claiming to have a mechanic's lien on defendants McKernans' real property, effective as of October 7, 1957, for $310.50, and interest, for which he prayed foreclosure and equitable relief.

Defendant Bernard M. McKernan filed an answer and counterclaim against plaintiff. He denied generally the allegations of plaintiff's petition and alleged in substance that the note and mortgage sought to be foreclosed were given for the purchase of a locker plant in Bellevue which was worthless; that said instruments were given without consideration; and that they had been fraudulently obtained by certain alleged material concealments and various alleged false representations made by plaintiff with regard to the condition, operation, and profits of the plant. Defendant then prayed for a dismissal of plaintiff's petition. As a counterclaim, said defendant included the allegations of his answer without repetition, and alleged that as a result of said alleged concealments and false representations, defendant was induced to quit his profitable employment as an automobile salesman in order to operate the locker plant, and was compelled to expend substantial sums attempting to repair the plant. He then prayed for $10,000 damages. Defendant Margaret A. McKernan also filed a comparable answer to plaintiff's petition and prayed for dismissal of plaintiff's petition.

Thereafter, plaintiff filed replies traversing defendants McKernans' answers and an answer traversing defendant Bernard M. McKernan's counterclaim, the affirmative material substance of which is hereinafter pointed out. Plaintiff also filed a reply to the answers,

and answers to the cross-petitions of defendants other than McKernan. Therein she denied generally but admitted that defendant Packers National Bank had a valid first mortgage lien on defendants' real property; that defendant Gerald Nathan, assignee, had a valid judgment lien thereon which was second in priority; that defendant Midwest Packing Company had a valid mortgage lien thereon but said lien was inferior to that of defendant Packers National Bank, Gerald Nathan, and plaintiff, which in effect would give defendant Midwest Packing Company a lien fourth in priority; that defendant Omaha Steak Company had a valid judgment lien thereon which, under the circumstances, in effect would give said defendant a lien fifth in priority; and that all of said defendants aforesaid were entitled to an accounting of the respective amounts due and unpaid, and to the equitable relief for which they respectively prayed. We find no merit in plaintiff's contention that she was entitled to judgment on the pleadings.

The record discloses that the cause was heard on the merits, whereat evidence was adduced by the parties and the cause was taken under advisement. Thereafter, a judgment was rendered which in substance refused foreclosure of plaintiff's second mortgage; ordered it stricken from the record; held it for nil; and cancelled plaintiff's note which the mortgage was given by defendants McKernan to secure. The judgment then dismissed said defendants' counterclaim about which no complaint is made in this appeal by cross-appeal, so it will not be otherwise discussed herein except to affirm such dismissal. The judgment then concluded that defendant Packers National Bank had a first mortgage lien on defendants McKernans' real property for $3,642.23 with interest at 4 percent from June 7, 1957, and ordered a foreclosure thereof as provided by law; and that defendant Gerald Nathan had a judgment lien on said property second in priority for the sum of $187 with interest and costs, in accord with the transcript of

said judgment on file. In that connection, no complaint is made here with regard to such portion of the judgment.

Thereafter, the judgment concluded that defendant Midwest Packing Company had a mortgage lien on defendants McKernans' real property for $1,699.27 with interest from October 25, 1957, which lien was *third* in priority; that defendant Omaha Steak Company had a judgment lien on defendants McKernans' real property for the sum of $79.01 with interest, which lien was *fourth* in priority; and that intervener John Brinjak, doing business as Town and Country Heating Company, had a mechanic's lien on said property for $310.57 with interest, which lien was *fifth* in priority; and ordered foreclosure, sale of the property, and equitable relief prayed by said defendants. No complaint is made here about conclusions reached in this paragraph except as to the italicized priorities of said liens, which, if plaintiff is entitled to the relief prayed by her, each should be found to be inferior to plaintiff's mortgage lien and respectively *fourth, fifth,* and *sixth,* in priority. As hereinafter observed, we conclude that plaintiff was entitled to such relief.

After plaintiff's motion for new trial, or in the alternative for judgment on the pleadings and evidence, was overruled, she appealed, assigning 43 alleged errors. Some 16 of such assignments related to claimed erroneous admissions of certain evidence which are disposed of, contrary to plaintiff's contentions, by Pierce v. Fontenelle, 156 Neb. 235, 55 N. W. 2d 658. As far as important here, the substance of all other assignments of error made by plaintiff is: (1) That the trial court erred in failing to sustain plaintiff's motion for judgment on the pleadings; (2) that the trial court erred in excluding certain evidence; and (3) that the judgment was not sustained by the evidence and was contrary to law. We sustain the last assignment.

Plaintiff's first assignment of erroneous exclusion of

evidence refers to the cross-examination of John Bressman, Jr., a witness for defendants McKernan, which allegedly appears in the bill of exceptions on pages 221 to 225, inclusive. In that connection, we find no exclusion of any evidence until pages 223 and 224 are reached. At that time, plaintiff offered two paragraphs in an affidavit made by the witness and delivered to plaintiff's counsel on August 21, 1957. The witness had denied that the second such paragraph truly reflected the facts, and such paragraphs were admitted without objection "for impeachment purposes," for which they were admissible. Plaintiff's second assignment of erroneous exclusion of evidence refers to the deposition of John Bowers, a refrigeration expert, read and offered by plaintiff and appearing in the bill of exceptions at pages 386 to 389, inclusive, and pages 394 to 399, inclusive. After careful examination of that portion of the record, we find that none of such evidence was eventually excluded. The answer to a question asked by plaintiff's counsel at page 401, which called for a "Yes" or "No" answer, which was answered as "Yes," was excluded after a general objection was made to the question. We think that the answer should have been admitted, but conclude that the exclusion was not prejudicial to plaintiff in any event because at page 432 another expert who originally installed the plant involved new in 1947 was permitted, over a like objection, to answer the same question in a more comprehensive manner favorable to plaintiff. We find no prejudicial error with regard to exclusions of evidence.

We turn then to the question of whether or not the judgment was sustained by the evidence or was contrary to law. In a determination of that question, the cause will be tried de novo in this court in conformity with the general rule reaffirmed in Town of Everett v. Teigeler, 162 Neb. 769, 77 N. W. 2d 467, and other applicable and controlling rules hereafter discussed.

The record is voluminous and we can only summarize

the material evidence. In doing so, Evelyn Nathan will be called plaintiff; Bernard M. McKernan and Margaret A. McKernan will be called defendants when referring to both; when referring to defendant Margaret A. McKernan separately, she will be designated by name; and when referring to defendant Bernard M. McKernan separately, he will be called defendant.

The locker plant was installed new by the York Corporation in 1947. Plaintiff purchased the plant in September 1948 for $10,000. In enlarging and remodeling the locker room a short time later, there was a leakage of ammonia from the pipes, which ordinarily are serviceable for many years. The reason for such leakage is not made clear, but it may be inferred that it was caused by some accidental means during the progress of such work. The condition was immediately remedied and there has been no leakage of ammonia since that time. In that connection, defendants contend that plaintiff failed to disclose that such leakage had occurred, and attempt to predicate fraud upon such concealment. We believe that such concealment was not material in point of time, but in any event the facts with regard thereto were generally known in the neighborhood, and defendants learned about such facts right after they took possession of the plant, began operation thereof, and continued to do so without any objection or complaint thereof made to plaintiff from November 16, 1951, to September 4, 1953.

The evidence discloses that plaintiff operated the plant successfully with two or three hundred customers until about July 20, 1949, when there was a fire in the locker room of the plant. As a result there was smoke damage and the beaver board which held the insulation in the ceiling pulled out through the nail holes caused by water sprayed thereon by the fire department. Also, water had accumulated in the basement where the motor and compressor were located on a cement foundation about 18 inches above the basement floor. The amount

of such water is in dispute as well as whether or not the plant was operating after the fire was put out. Be that as it may, there is competent expert evidence that in any event such water would damage only the electrical portion of such equipment which could be readily repaired. There is competent evidence that after the insurance companies had adjusted the fire loss and litigation had arisen with regard thereto in the district court for Douglas County, plaintiff and her employees cleaned up the plant, repaired the insulation, checked the equipment, put a new modern wooden ceiling in the plant, and plaintiff claimed that the plant was then in condition to be operated properly again. Also, there is competent evidence by an expert that the plant was in good working order as checked, oiled, and regulated by him as late as March 1951.

However, in the meantime, plaintiff had purchased such a plant at Fullerton, Nebraska, and moved there where her sons operated it. Therefore, she ceased to operate the plant here involved and put it up for sale after the fire and the plant had been cleaned and repaired. In that connection, defendants' contention is that plaintiff failed to disclose that such a fire had occurred and the extent of the damages caused thereby, and defendants attempt to predicate fraud upon such concealment. In such respect, plaintiff contends that she told defendants about the fire, and it is clear that it was well known in the neighborhood that such a fire had occurred. Defendants learned such fact right after they took possession of the plant, began operation thereof, and continued to do so without complaint or objection made to plaintiff from November 16, 1951, to September 4, 1953.

In July 1951, defendant was an automobile salesman for an automobile and garage firm in Omaha. He first met plaintiff in July 1951, when she came to said garage to have a car serviced. Defendants were anxious to get into business for themselves and defendant so in-

formed plaintiff, whereupon she told him that she had the locker plant here involved for sale; that it was a money-making business; and the only reason she was not operating it was that she had bought another plant at Fullerton where she then resided, and she had no one to manage the plant at Bellevue. Thereafter, plaintiff and defendants met some six different times between July 1951, and November 14, 1951, by prearrangement, and talked at length about defendants purchasing the plant. At one of such times defendants' lawyer was present, and upon another occasion defendants went out to the plant with plaintiff, where they were shown and inspected every part of it. At that time, as stated by defendant, the plant looked "bad" and "Actually, it looked crummy," but defendants claimed that plaintiff said she guaranteed the plant would work; that it was in good working condition and operated automatically on thermostatic impulse. Defendants noticed at that time that the lockers were chipped and rusted, but plaintiff said all they would have to do would be to put some paint on them and they would be all right, which defendants expected to do.

It was finally agreed that defendants would buy the plant from plaintiff for $8,500. In that connection, the plant was clear of encumbrances and plaintiff desired to take a mortgage back on the plant to secure defendants' note, but defendants, who were without any capital on which to operate the plant, wanted it to be without encumbrance, so they could obtain credit thereon in their business. Therefore, as proposed by defendants, plaintiff agreed to take a second mortgage on defendants' real property to secure payment of the purchase price of the plant. Thus, by prearrangement, the parties appeared on November 14, 1951, at the office of plaintiff's lawyer, where he prepared defendants' promissory note for $8,499, payable to plaintiff, the mortgage on defendants' described real property to secure payment of the note, and an itemized bill of sale to the

machinery and equipment, same being "personal property known as the Bellevue Locker Plant." Such instruments were dated November 14, 1951, at the same time and place. Plaintiff was then paid $1 in cash, and each of said instruments was signed, executed, and delivered by and to the respective parties for the purpose of completing the sale. As in Blum v. Poppenhagen, 142 Neb. 5, 5 N. W. 2d 99, citing Thompson v. Jost, 108 Neb. 778, 189 N. W. 169, such instruments will be considered as one instrument and read and construed together. At the start of the trial herein, it was stipulated that such instruments had been so executed and delivered without prejudice to defendants' plea of failure of consideration and that they were obtained by misrepresentations. In that connection, contrary to plaintiff's contention, "The defense on the ground of fraud may be shown by parol, not to contradict or vary but to destroy the legal and binding effect of a written instrument." Paper v. Galbreth, 121 Neb. 454, 237 N. W. 582.

On November 16, 1951, defendants took possession of the plant and one of plaintiff's sons, who was an experienced operator of such plants and had worked in the plant involved from November 1948 to May 1949, and had inspected it as late as October 1949, showed defendants how to start and shut off the refrigeration and supervised its operation for 3 or 4 days, beginning November 17, 1951. He testified that the plant operated normally and properly while he was there. However, defendant testified that plaintiff's son operated the plant only a short time, and did not run the machinery or equipment long enough to see whether or not it operated to produce the required temperatures for refrigeration. He testified that he learned at once that the plant did not operate automatically but had to be operrated manually by pulling a switch off and on again; that he had no customers until about the middle of the next week; that if run continuously, the plant would not

reach a low enough temperature for purposes of refrigeration; and that he had spoilage of meat and other foods for which defendants were liable. Thus, being without funds, defendant got a job outside of the plant, and about Thanksgiving time defendants hired an experienced locker man to manage the plant while defendant's wife and his nephew worked part time in the plant. Also, in December 1951, defendants hired a plant repair company to work on the plant 3 or 4 days and it operated some better for a period of time, but in about a month the motor and compressors burned out and the control piston started to knock, although they ran the plant 4 hours on and 2 hours off around the clock to keep such machinery cool. Defendants elaborated upon the almost continuous spoilage aforesaid, complaints by customers, and the fact that they had the expense of paying customers for such spoilage and for the making of repairs upon the plant. Defendant claimed that he called plaintiff on the telephone several times to tell her about his troubles but she would not answer, and that in January 1952, he wrote plaintiff about his difficulties and she replied that he should see her lawyer. However, plaintiff denied that defendant ever called her or that she refused to talk to him or that such letters were written, which seems to be true because defendants never went to see plaintiff's lawyer and they knew at all times where plaintiff lived but never went there to see her. In that connection, about May or June 1952, plaintiff and defendants met at Packers National Bank by prearrangement. There, an unsuccessful attempt was made by the defendants to sell plaintiff the very property which defendants had mortgaged to her, because they needed funds to operate the plant. However, no complaint was made there by defendants about the condition of the plant; no contention was made there that they had been defrauded; and they never offered to return the property at any time. Also, it will be noted that although plaintiff sent de-

fendants notices when payments on their note and mortgage were due, they never answered such notices or paid any sums whatever thereon. In that connection, "It is not the duty of a creditor to seek out his debtor—it is the duty of the debtor to seek his creditor." Meier v. Geldis, 148 Neb. 234, 26 N. W. 2d 813.

Defendants testified that they tried to obtain customers from a customer card file furnished by plaintiff, as recited in the bill of sale, but that the plant continually failed to operate as it should, and their hired manager left in about 4 months because defendants could not afford to pay him and, as testified by him, he quit because payments on his salary checks were being stopped. In that connection, such manager testified that during that period, defendants had continuous difficulty with refrigeration because they could not keep the temperature down where the plant would refrigerate properly. However, he testified that at first several of his friends followed him to the plant and the first 2 weeks defendants took in about $725, but when he left they had only a few customers. Be that as it may, defendants' landlord testified that he was in the plant regularly to collect the rent from defendants from November 14, 1951, to September 4, 1953, when defendants simply locked the door and abandoned the plant after he had served an eviction notice upon them because they had paid no rent for a year. He also testified that defendants had listed the plant for sale with him as a real estate operator, and that defendants' manager aforesaid had talked with him about buying it. In that connection, such manager admitted in an affidavit given plaintiff's attorney on August 21, 1957, that defendants took in about $714 from sales and locker rentals the first week he was manager; that the business continued to favorably hold its own while he was there; and that during the summer of 1952 he and another named person offered defendants $7,000 for the plant but they would not sell.

In any event, defendants kept right on operating the plant from November 16, 1951, until September 4, 1953. During that period they exchanged part of the equipment purchased from plaintiff for new equipment; kept whatever money they could get from customers; went into debt for plant obligations and paid but little if any thereof; and then listed the plant for sale with realtors. In September 1953, allegedly having only eight or nine customers who could be located, defendants took everything out of their customers' rented lockers; put it in another refrigeration plant; and then, "We just turned the key and walked away." Thereupon, defendants' landlord and other creditors were permitted, without plaintiff's knowledge or consent, to dismantle and take out of the plant and salvage whatever equipment they desired.

With regard to defendants' claim that they had only eight or nine customers whose products were transported to another plant, a copartner thereof produced a list of 42 customers of defendants dated September 4, 1953, when defendants brought the frozen food and products of such customers from their plant. She testified that the foods were in good condition, and that each of such customers had unexpired time coming for locker rentals and defendants agreed to pay for such unexpired time, which came to a total of $254.75 at defendants' rates, no part of which defendants ever paid. The copartner testified that some other customers also came over from defendants' plant and renewed contracts there, and that the products of some others, who had only a short time left on locker rentals, were simply put and kept in a room with only ledger charges made therefor. In the foregoing situation, defendants made no complaint or claim against plaintiff, and took no action seeking redress for alleged damages for fraud until May 16, 1956, after plaintiff had filed this action on March 2, 1956, a period of more than 4 years after knowledge of plaintiff's alleged fraud.

Plaintiff herein pleaded and argued that defendants' defense was barred by the statute of limitations. In that connection, defendants' answers were in effect a defense of recoupment. In Oft v. Dornacker, 131 Neb. 644, 269 N. W. 418, and again in Mettlen v. Sandoz, 131 Neb. 625, 269 N. W. 98, this court concluded that the defense of recoupment or reduction of plaintiff's claim must arise out of the same transaction as plaintiff's claim, and survives as long as plaintiff's cause of action exists, even if affirmative legal action upon the subject of recoupment is barred by the statute of limitations. Therefore, plaintiff's contention with regard to the statute of limitations barring defendants' claim has no merit.

As stated in 77 C. J. S., Sales, § 22, p. 626: "As a general rule there is an entire failure of consideration where the property purchased is entirely worthless * * * there is not a failure of consideration if the property is not entirely worthless, or if it has any substantial value, although less than the consideration paid * * * as where, by reason of some unsoundness or imperfection, it is merely diminished in value, * * *."

In Cotner College v. Estate of Hester, 155 Neb. 279, 51 N. W. 2d 612, we held: "Where there is a total failure of consideration and defendant has derived no benefit from the contract, or none beyond the amount of money which he has already advanced, such failure of consideration may be shown in bar of the action." In the light of evidence heretofore summarized, we conclude that defendants' contention that there was an entire failure of consideration because the plant was worthless, is entirely fallacious and has no merit. If the plant ever was worthless, it finally became so because of defendants' own affirmative acts and negligent conduct, for which they were entirely responsible.

In Boettcher v. Goethe, 165 Neb. 363, 85 N. W. 2d 884, we held that: "The asking of a certain price for an item of property is not a representation of its value." In the case at bar, the retired manager of York Corpora-

tion, which installed the plant involved new in 1947, testified that in 4 years it would generally have a 28 to 30 percent depreciation, and that on November 14, 1951, $8,500 would be a fair and reasonable price for the plant.

Also, in Boettcher v. Goethe, *supra,* this court said: "In Cook Livestock Co., Inc. v. Reisig, 161 Neb. 640, 74 N. W. 2d 370, this court referred to the elements of fraud including the one that a representation to be fraudulent must be made either with knowledge of falsity or without such knowledge as a positive statement of known fact and continued: 'In addition to the above, the general rule * * * is that fraud must relate to a present or preexisting fact, and cannot ordinarily be predicated on representations or statements which involve mere matters of futurity or things to be done or performed in the future. * * * It is a general rule that fraud must relate to a present or preexisting fact, and cannot be ordinarily predicated on unfulfilled promises or statements as to future events. * * * False representations, in order to found an action in the nature of deceit, must not consist merely of promises to be performed in the future, and generally not merely of expressions of opinion by a vendor as to the quality of his goods. They must be representations of known existing facts.' " In that connection, defendants had inspected the entire plant before purchasing it. They said that it looked bad. Nevertheless, we may assume that plaintiff told defendants that the plant would work; that it was in good working condition; and that it contained a "self contained unit arranged for automatic control" as stated in the bill of sale; and that such representations were false in material respects. However, under the circumstances in this case, defendants by their own affirmative acts and conduct have waived fraud as a defense.

In Hollenbeck v. Guardian Nat. Life Ins. Co., 144 Neb. 684, 14 N. W. 2d 330, this court held that: "Where

one is put upon inquiry, he is charged with notice of all of such facts as he would have learned by reasonable inquiry." See, also, Abels v. Bennett, 158 Neb. 699, 64 N. W. 2d 481, wherein we held that: "A defrauded party must be diligent and prudent in his effort to detect the fraud and means of knowledge thereof are equivalent to knowledge."

In that connection, if there was any fraud, as defendants contend, they became aware of it and had full knowledge thereof at all times from and after the week of November 16, 1951. However, defendants took no steps to return the property or to call plaintiff's attention to the defects thereof, but they affirmatively proceeded to ratify and perform the contract until the plant was dismantled and destroyed by the affirmative acts and conduct of defendants who are responsible therefor, and they are estopped to claim otherwise. See State v. Nielsen, 163 Neb. 372, 79 N. W. 2d 721, wherein we held: "When a person knowing his rights takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of the right."

Plaintiff has pleaded estoppel and waiver of defendants' alleged fraud, if any. In that connection, as early as Hazen v. Wilhelmie, 68 Neb. 79, 93 N. W. 920, this court held that: "In an action upon a contract for the sale of chattels, evidence by the purchaser that after the delivery of the subject matter he inspected, retained and used it as a whole, shows both an acceptance and a waiver of any objection that the quality was not such as the contract required."

As recently as Dargue v. Chaput, 166 Neb. 69, 88 N. W. 2d 148, citing authorities, we held: "A right of action for fraud may be waived. Thus, while the defrauded party may retain what he received, stand to his bargain, and recover for the loss occasioned by the

fraud, he cannot do so where, having full knowledge, he does an act indicating his intention to waive the fraud.

"It is, however, difficult and perhaps hazardous to formulate or to apply general rules as to what will constitute such a waiver, and each case in which the question arises must be considered and disposed of on its own special facts, the underlying question being one of intent.

"Accordingly acts in affirmance of the contract amount to a waiver of the fraud only where they are done with full knowledge of the fraud and. of all material facts and with the intention clearly manifested of abiding by the contract and waiving all right to recover for the deception." See, also, 56 Am. Jur., Waiver, § 5, p. 106; Restatement, Contracts, § 484, p. 924. If there ever was a case wherein defendants waived the fraud and were estopped to claim damages by way of recoupment or otherwise, this is one of them.

For reasons heretofore stated, we conclude that the trial court erred in refusing to foreclose plaintiff's mortgage and in cancelling plaintiff's note. Therefore, the judgment of the trial court should be and hereby is reversed and the cause is remanded with directions to render a judgment determining the amount due and unpaid on plaintiff's note and mortgage executed and delivered to plaintiff by defendants on their described real property, and foreclosing said mortgage as a third lien. Also, the judgment shall fix the respective priorities of the liens of other defendants heretofore mentioned, and grant the relief as prayed for by them, in conformity with this opinion. All costs are taxed to defendants McKernan.

REVERSED AND REMANDED WITH DIRECTIONS.

SIMMONS, C. J., not participating.