DONALD S. DARGUE ET AL., APPELLEES, V. ERNEST CHAPUT ET AL., APPELLANTS.

88 N. W. 2d 148

Filed February 14, 1958. No. 34281.

70

*Victor H. Schmidt,* for appellants.

*Neely, Otis & Neely,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is an appeal from the district court for Sarpy County. It involves an action instituted therein on July 24, 1956, by Donald S. Dargue and Garnet A. Dargue against Ernest Chaput and Angelyn Chaput for the purpose of rescinding a contract entered into by the plaintiffs with the defendants for the purchase of a residential property located at 8525 Bellevue Boulevard in Sarpy County, Nebraska. The grounds alleged as a

basis for rescinding are that plaintiffs were induced to enter into the contract by the fraudulent misrepresentation and concealment of certain facts relating to the condition of the property purchased.

"A party who has been induced to enter into a contract by fraud has, upon its discovery, an election of remedies. He may either affirm the contract and sue for damages or disaffirm it and be reinstated to the position he was in before it was consummated." Russo v. Williams, 160 Neb. 564, 71 N. W. 2d 131.

Trial was had and on January 9, 1957, the trial court rendered its decision which denied plaintiffs the rescission they had asked for. In view of the evidence adduced at that hearing the trial court was justified in doing so in view of our holding in Russo v. Williams, *supra.* Therein we quoted with approval the following from 66 C. J., Vendor and Purchaser, §§ 476 and 477, pp. 824 and 825: "If the purchaser has knowledge of the grounds upon which he is entitled to rescind, an unreasonable delay upon his part, especially if accompanied by such change of circumstances as makes it impracticable for him to place the vendor in statu quo, * * * prevents him from exercising his right to rescind. Even where time is not of the essence of the contract, a purchaser may still lose his right to rescind by delaying action to a time, which, under the circumstances, is unreasonable. * * * The question whether laches exists in a particular case depends upon its own peculiar circumstances and is addressed to the sound discretion of the court, the question of the unreasonableness of the delay depending largely upon the nature of the property in the particular case."

However, the trial court did not thereupon dismiss plaintiffs' action but granted them 60 days in which to amend their pleadings to state a cause of action in fraud for damages. This was in accordance with our holding in Russo v. Williams, *supra,* under the principle that: " 'It is the practice of courts of equity, when they once

have obtained jurisdiction of a case, to administer all the relief which the nature of the case and the facts demand, and to bring such relief down to the close of the litigation between the parties.' (Herrin v. Johnson Cashway Lumber Co., 153 Neb. 693, 46 N. W. 2d 111.)" The plaintiffs filed a second amended petition on March 7, 1957, seeking recovery of damages because of fraud.

In their second amended petition, on which the cause was tried, the plaintiffs alleged that:

"In the showing of said premises and endeavoring to effect a sale, nothing whatsoever was said to the plaintiffs, or either of them, by defendants or by the agent of the defendants, Joseph M. Morgan, to effect that said house was built on ground incapable of supporting it, nor was there at any time prior to August 20, 1955, any evidence patent and available to the plaintiffs that the said house was not structurally sound and in good condition. Moreover, said agent agreed specifically that the house was to be finished in a manner of good workmanship. The plaintiffs believed the statements and representations of said agent as aforesaid to be true and relied upon them and as a result of the same were induced to purchase the property. * * *

"Plaintiffs further allege that the aforesaid house was constructed without there being provided adequate drainage, in the form of drainage tile or otherwise, of the front, or west, yard of the premises. As a result of this inadequacy, water has been allowed to pocket in front or to the west of the west basement wall, causing a continual settlement of the fill in front of it and exerting upon it a pressure accentuating the eastward tipping of the east wall as it settles on inadequate ground support. * * *

"Plaintiffs further allege that defendants at all times referred to had full knowledge of all the facts that lead to the ultimate conclusions: (1) That the foundation of the house rested on filled earth, or on earth of insufficient bearing value to support the load of the house

in violation of good building practices, and (2) that the front, or west yard of the house was provided with inadequate drainage to the end that water was allowed to accumulate in the fill lying to the west of the west basement wall exerting a pressure upon said wall and upon the house in general to the end that it was tipped and is still being tipped to the east, all in violation of good building practices. Defendants intentionally, wilfully and fraudulently withheld and concealed said information from the plaintiffs for the express purpose of deceiving and defrauding them. * * *

"Plaintiffs further allege that had the defendants Chaput not made the representation that the house would be finished in a manner of good workmanship as aforesaid and had the plaintiffs known that the house had been built on filled ground or on ground inadequate to support it or that ground water to to (the) west would be allowed to exert an undue pressure on the west wall, they would not have purchased said premises. Plaintiffs relied upon said representations and without knowledge to do otherwise acted upon them to their damage."

Trial was had on the action for damages. On May 27, 1957, the trial court rendered a judgment for the plaintiffs in the sum of $4,287.50 with interest at 6 percent from June 10, 1955. Defendants filed a motion for new trial and, from the overruling thereof, perfected this appeal.

Appellees, Donald S. Dargue and Garnet A. Dargue, are husband and wife. We shall herein refer to them as the Dargues and to Donald S. Dargue individually as Dargue. Appellants, Ernest Chaput and Angelyn Chaput, are husband and wife. We shall herein refer to them as the Chaputs and to Ernest Chaput as Chaput.

Sometime in 1948 the Chaputs bought a home located at 8521 Bellevue Boulevard in Sarpy County, Nebraska. This home was on a 9½-acre tract of wooded and pasture land lying east of and adjacent to Bellevue Boulevard. The Chaputs purchased the entire tract. Belle-

vue Boulevard is a surfaced street and will hereinafter be referred to as the boulevard. The Chaputs established a road across this tract. The road is located just south of their residence at 8521 Bellevue Boulevard and runs east from the boulevard. They named it Chaput Drive. The 9½-acre tract extended south of Chaput Drive on the boulevard for a distance of 175 feet. In 1954 the Chaputs decided to improve the area south of Chaput Drive as it faces the boulevard and, for that purpose, divided it into two lots each 87½ feet wide as they front to the west on the boulevard, and 150 feet in depth from the boulevard toward the east.

Chaput contacted Norris L. Keenan, a building contractor who lived in the neighborhood, in regard thereto. Chaput had roughly sketched out plans of the kind of houses he wanted built on these two lots from plans he had borrowed from a neighbor. These he presented to Keenan. Keenan then caused drafts to be drawn of floor plans of a house in accordance with Chaput's suggested ideas and, based thereon, submitted specifications and a bid for the construction thereof. Chaput accepted Keenan's bid. On November 4, 1954, Chaput and Keenan entered into a written contract for the construction of a house in accordance therewith at 8523 Bellevue Boulevard, which is the lot immediately south of Chaput Drive.

After Keenan had started construction of this house Chaput and Keenan testified they entered into an oral agreement to construct a house on the south lot, identified as 8525 Bellevue Boulevard, based on the same floor plans, specifications, and bid as used in connection with 8523 Bellevue Boulevard. This was sometime in January 1955. The construction of this house began in either January or February of 1955 and was, for all practical purposes, completed by June 10, 1955, on which date the Dargues entered into a written agreement with the Chaputs for the purchase thereof. The sale was consummated through Joseph M. Morgan, a real estate

broker of Bellevue, Nebraska, with whom the Chaputs had listed the property for sale. Before buying the house Dargue made a thorough inspection thereof.

The house constructed is a one-story bungalow type. It is in about the center of the lot from north to south and faces west toward the boulevard. It is some 40 feet from the surfaced area thereof, being about 25 feet from the boulevard itself. It has a full basement which is constructed with cement block walls and has a rear walkout door to the east. The main floor of the house, which rests on the basement walls, is some 3 or 4 feet below the level of the surfaced part of the boulevard. The garage is attached to and located at the north end of the house. The width of the front of the house is 42 feet, the garage 14 feet. A driveway leads from the garage west to the boulevard. The areas all around the house were filled to adjust to this construction, the area west of the house being filled in so as to slope down from the boulevard. The filled ground was landscaped and contoured so any water coming onto the surface thereof would flow east from the area north of the driveway and south and east from the area south of the driveway and west of the house.

The Dargues moved into the house in the early part of July 1955. Sometime between August 20 and 25, 1955, the Dargues noticed a thin vertical crack appearing in the north wall of the house at a point some short distance west of the northeast corner thereof. Dargue immediately notified Chaput thereof. Chaput thereupon contacted Keenan who immediately inspected this condition. The crack widened, particularly at the top of the wall. After some 4 months it was about 1½ inches wide at the top and wide enough to permit a person's hand to be inserted therein. Chaput and Keenan conferred on what to do. Winter was coming on so they did not think it advisable to try and repair the wall then, especially not before the condition causing the crack had been eliminated. Chaput and Keenan

could not agree as to what should be done to eliminate the cause, each having his own ideas in that regard. Keenan advocated the construction of cement pylasters against the outside of the east wall just below the filled-in grade line. These were put in in October 1955. Chaput advocated reinforcing the east wall by the use of rods under the basement floor welded to a 3 x 4 inch steel beam, 20 feet long, placed therein in cement parallel to the east, which rods would be run through holes in steel plates lodged against the outside of the east wall just below the filled-in grade line and tightened by the use of nuts placed on the ends thereof. This was done in November 1955. Thereafter, in the latter part of March and the first week of April 1956, the northeast corner of the cement block wall that was above the ground level was replaced for a distance of some 20 feet to the south and 6 feet to the west of the northeast corner. The floor in the northeast corner of the basement was also repaired. These safeguards and corrective measures were apparently taken on the theory that the crack in the north wall was caused by a settling of the foundation of the house at the northeast corner thereof. While this was true, it was not the primary cause thereof. This is evidenced by the fact that new vertical cracks started to appear therein shortly after the wall was repaired. They appeared not only in the north wall just west of where the first crack had been but also in the south wall of the house. We have herein only referred to the damage to the house as it appeared in the outer walls. Similar cracks appeared at various places in the house and caused substantial damage thereto.

The Dargues had an expert in this field check the house. He came to the conclusion that the damage was primarily being caused by lateral pressure on the west wall of the basement, resulting from water pressure thereon, which was causing the frame structure of the house to tip and thus place eastward or outward pres-

sure on the top of the east wall and causing it to tilt outward. It was his opinion that this pressure primarily caused the damage to the house. The Chaputs also had an expert examine the premises and while he also came to the conclusion that water pressure was causing the damage he was of the opinion it resulted from pressure on the west side of the east wall below the basement floor. It was his theory that water coming against the west wall would seep under it and then move east under the basement floor until it reached the east wall and cause pressure thereon. While these experts disagreed as to where the pressure that was causing the damage was being exerted both agreed that it was being caused by lateral pressure from water seeping from west of the house.

In its natural state the area south of Chaput Drive sloped down toward the east from the boulevard at about 45 degrees. It also sloped down from Chaput Drive toward the south and from the south edge of this area toward the north thus forming, as it was referred to by Chaput, a "gully." When the house was constructed the main floor thereof was some 3 or 4 feet below the surface of the boulevard. This made necessary a very substantial fill to the west thereof in order to make the front yard come up to near floor level. While doing this with a caterpillar tractor the vibration thereof on the filled dirt, together with the pressure of the packing of the filled dirt against the foundation, caused a crack to appear in the west basement wall between the second and third tier of cement blocks down from the top thereof. This crack, which was about 25 feet long, necessitated a repairing of the wall. When this occurred, which was after the foundation had been built and the frame of the house partly constructed, Keenan contacted Chaput as to what should be done. As a result of this conference five 4-inch-square "H" steel piling were placed on the inside of the west wall to hold it against the pressure of this filled dirt. These

steel piling were anchored in cement at their base and fastened to the rafters at the top. The surface of the filled ground was contoured to drain but nothing else was done in regard to draining off any water that would naturally flow thereon and seep into the ground.

It is apparent that this filled dirt was not sufficiently packed when put in and soon settled and formed a pocket or basin from which the water coming thereon could not escape. When water collected therein its natural tendency was to seep into the ground and flow toward the east and against the west wall. Whether it resulted in pressure against this or the east wall, a question about which the experts seem to be in dispute, it is apparent that the lateral pressure of this water against one of these walls caused the damage to the house. We think it was the result of pressure on the west wall which the evidence shows was damp and bulged inward.

In view of the natural drainage of the ground on which this house was built, we think the manner in which the drainage thereof was handled was faulty and resulted in a latent defect which could not be observed by a purchaser thereof upon inspection of the property prior to any damage being caused to the house by reason thereof. Before discussing the facts further we think it would be desirable to set out the legal principles applicable thereto and to which we will hereinafter relate our discussion thereof.

This action had its inception in equity. Although the original relief asked for was not available to the appellees the trial court retained jurisdiction to administer all the relief which the nature of the case and the facts demanded. In this situation our review is governed by section 25-1925, R. R. S. 1943, and, upon such review, "* * * when the evidence on material questions of fact is in irreconcilable conflict this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their

manner of testifying and must have accepted one version of the facts rather than the opposite." Rettinger v. Pierpont, 145 Neb. 161, 15 N. W. 2d 393. See, also, Russo v. Williams, *supra.*

" 'If, with the intent to deceive, either party to a contract of sale conceals or suppresses a material fact, which he is in good faith bound to disclose, this is evidence of and equivalent to a false representation, because the concealment or suppression is in effect a representation that what is disclosed is the whole truth. The gist of the action is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of the plaintiff.' (Stewart v. Wyoming Cattle Ranche Co., 128 U. S. 383.)" Linton v. Sheldon, 98 Neb. 834, 154 N. W. 724. See, also, Wolford v. Freeman, 150 Neb. 537, 35 N. W. 2d 98.

"Fraud is never presumed, but must be clearly proved in order to entitle a party to relief on the ground that it has been practiced on him." Davidson v. Crosby, 49 Neb. 60, 68 N. W. 338. See, also, Krelle v. Bowen, 128 Neb. 418, 259 N. W. 48.

"* * * courts of equity do not restrict themselves by the same rigid rules as courts of law in the investigation of fraud and in the evidence and proofs required to establish it." 19 Am. Jur., Equity, § 43, p. 67. See, also, Rettinger v. Pierpont, *supra;* Russo v. Williams, *supra.*

"The rule is: 'Direct evidence is not essential to establish fraud. It may be inferred from circumstances; but such inference must not be guesswork or conjecture, but the rational and logical deduction from the circumstances proved.' Alter v. Bank of Stockham, 53 Neb. 223, 73 N. W. 667." Herlan v. Bleck, 148 Neb. 816, 29 N. W. 2d 636. See, also, Russo v. Williams, *supra.*

" 'Whether in an action for damages for false representations it is necessary either to aver or prove the scienter, the authorities do not agree. The better rule, and the one adopted by this court, is that the intent or good faith of the person making false statements is not in issue in such a case.' Johnson v. Gulick, 46 Neb. 817." Newberg v. Chicago, B. & Q. R. R. Co., 120 Neb. 171, 231 N. W. 766. See, also, Taxpayers' League v. Wightman, 139 Neb. 212, 296 N. W. 886; Russo v. Williams, *supra*.

"As between vendor and purchaser, where material facts and information are equally accessible to both, and nothing is said or done which tends to impose on the purchaser or to mislead him, the failure of the vendor to disclose such facts does not amount to actionable fraud; but where such facts are known by the vendor and he knows them to be not within reach of the reasonably diligent attention, observation, and judgment of the purchaser, and they are such as would readily mislead the purchaser as to the true conditions of the property, the vendor is bound to disclose such facts." Wolford v. Freeman, *supra*. See, also, O'Shea v. Morris, 112 Neb. 102, 198 N. W. 866; Restatement, Contracts, § 472, p. 897; Clauser v. Taylor, 44 Cal. App. 2d 453, 112 P. 2d 661; Gellis v. Claremont Masonic Assn., 85 N. H. 416, 159 A. 295.

If the defects are concealed, such as was the situation here, they are latent. Russo v. Williams, *supra*. Under the foregoing principles the vendor of real property is not guilty of fraud for a failure to disclose material latent defects which are unknown to him unless it can be shown that he was aware of such circumstances that a reasonable inference can be said to arise therefrom that he either knew or should have been aware of the fact that such latent defective conditions existed.

We come then to the specific claims of misrepresentation and concealment alleged by the Dargues as the basis on which they seek to recover damages because they relied thereon and were defrauded thereby. Joseph M.

Morgan, the real estate broker with whom the Chaputs listed the property for sale, was their agent and in selling the property to the Dargues through him they were bound by his conduct in doing so to the following extent: "'A principal who authorizes an agent to conduct a transaction for him, intending that the agent shall make representations to another in the course of it which the principal knows to be untrue, is liable for such misrepresentations as if he himself had made them intentionally; if, although he does not intend that the agent shall make misrepresentations, he should know that the agent will do so, the principal is liable as if he himself had made them negligently.' 1 Restatement, Law of Agency, 565." Ashby v. Peters, 128 Neb. 338, 258 N. W. 639, 99 A. L. R. 843. See, also, Wolford v. Freeman, *supra;* Newberg v. Chicago, B. & Q. R. R. Co., *supra;* Modern Woodmen v. Berry, 100 Neb. 820, 161 N. W. 534, Ann. Cas. 1918D 302.

During the course of the negotiations between Dargue and Morgan leading up to the sale of the premises neither was aware that there were any latent structural defects therein as a careful examination thereof made by Dargue failed to disclose any as he testified the house seemed to be structurally sound. In fact neither Dargue nor Morgan was aware of the fact that any latent structural defects existed and Morgan made no statements in regard thereto or in regard to the condition of the house in respect to its structural soundness. Dargue did discover several items that the builder of the house had failed to properly finish, such as a failure to connect a light switch to a circuit, a failure to connect the doorbell, a failure to supply storm windows, and other things of that nature. In order to make sure that these items would be taken care of the following language was put in the purchase agreement: "House to be finished in a manner of good workmanship." This provision was not intended to guarantee that the house was structurally sound but rather to guarantee that the things which

Dargue had discovered as being unfinished would be taken care of and apparently they were. We find nothing in the record to the effect that Morgan in any way misrepresented or concealed any facts from Dargue during the negotiations leading up to the sale of the property of which he was aware and which it was his duty, as agent, to disclose.

It is, of course, true that if Morgan had made a positive statement to the effect that the house was structurally sound, when in fact it was not although he was not aware of that fact, his principal would be bound thereby and the Dargues would be entitled to relief. As stated in Phillips v. Jones, 12 Neb. 213, 10 N. W. 708: "* * * if a party, without knowing whether his statements are true or not, makes an assertion as to any particular matter upon which the other party has relied, the party defrauded in a proper case will be entitled to relief." See, also, Russo v. Williams, *supra*. In Hoock v. Bowman, 42 Neb. 80, 60 N. W. 389, 47 Am. S. R. 691, we said: "A purchaser of real estate has a right to believe and rely upon representations made to him by his vendor as to the character, quality, and location of the property, when the facts concerning which the representations are made are unknown to the vendee." But that is not the situation here.

While the evidence in regard thereto is in direct conflict we think it establishes there was faulty construction in the building of the house by placing the foundation thereof, particularly at the northeast corner, on ground with insufficient weight-bearing qualities to sustain the weight placed thereon. While we do not think it was the primary cause of the damage that subsequently occurred to the house, however, we find that it did permit a vertical settling and a slight tipping of the east wall at that point and contributed directly to causing the damage in the north wall when pressure came on top of the east wall due to the frame of the house being moved slightly to the east from lateral

pressure against the west wall of the house when water started pressing against it.

This water pressure resulted from inadequate drainage being provided for water collecting on the filled ground to the west thereof. This faulty construction permitted this water to collect there and seep down against the west wall, thus causing the lateral pressure we have already mentioned and which caused the frame structure of the house to exert outward pressure against the top of the east cement block wall. The amount of water that collected west of the house was increased by the fact that a gutter was placed along the west edge of the roof thereof which was inadequate to carry the water coming into it during a heavy rain and, as a consequence, water would spill out onto the yard in front of the house. The failure to provide adequate drainage for all water coming on the front yard we find was the primary cause of the damage to the house and was latent in its character since it could not be detected merely by observation. We do not think any lack of care in keeping up the yard by the Dargues caused this condition to arise or in any material way contributed thereto.

The question then arises, was Chaput aware of these conditions? The evidence discloses that Chaput had, through experience, considerable knowledge concerning drainage and that he was fully acquainted with the land on which the house at 8525 Bellevue Boulevard was built since it was part of a tract he had owned since 1948 and which was only some 200 feet from where he lived at 8521 Bellevue Boulevard. After the construction of the house began at 8525 Bellevue Boulevard he was there at least as often as once a week. When there he would look over the construction and confer with Keenan about different features thereof and make suggestions in regard thereto. When the crack occurred in the west wall as the result of the caterpillar incident Keenan contacted Chaput about it and, as a result, the steel beam supports were put on the inside of the west

wall. At that time Chaput must have observed the fill that was being made west of the house, the effect it was having and would have on the west wall, and what was being done to take care of the water that would naturally fall and flow thereon. We do not think Chaput is now in a position to say he did not know what was being done by Keenan in this respect.

But the Chaputs contend that Keenan was an independent contractor and that, insofar as they are concerned, the following principle applies to their relationship with him: "* * * one who contracts for a stipulated price to build a house for another who reserves no direction over the conduct of the work is an independent contractor; * * *." Restatement, Agency, § 2, p. 13.

It is true that both Chaput and Keenan testified that Keenan orally agreed to build the house at 8525 Bellevue Boulevard for the same price as he had, by written contract, agreed to build the house he constructed for Chaput at 8523 Bellevue Boulevard, the idea being to use the same plans and specifications as were used in constructing 8523 Bellevue Boulevard. The statements submitted to Chaput by Keenan and the payments thereof, made by check, would bear this out. However, as we said in Bodwell v. Webster, 98 Neb. 664, 154 N. W. 229, Ann. Cas. 1918C 624: "The relation existing between defendants and Hanford is not evidenced wholly by the written instrument. (Here an oral agreement.) It is affected by extrinsic facts and circumstances from which different deductions may reasonably be drawn. Under these conditions, whether Hanford was an independent contractor was a question for the jury. (Here the court.)"

As already stated, during the course of constructing the house at 8525 Bellevue Boulevard, Chaput would confer with Keenan in regard thereto and make suggestions as to the construction thereof and, when difficulties arose, Keenan would call on Chaput for advice in regard thereto. When Dargue informed Chaput of the

crack Chaput immediately contacted Keenan and the two of them attempted to solve the problem and subsequently caused the damaged wall and basement floor to be repaired. In doing so they used material and labor from other properties they were constructing on the Chaputs' land on a 50-50 partnership basis. These were to the north and east of 8525 Bellevue Boulevard on Chaput Drive. In other words, Chaput and Keenan were bearing the expense of the damage to the Dargue house on a 50-50 basis. We think, considering all of the circumstances, that Keenan did not build the house at 8525 Bellevue Boulevard as an independent contractor but as he was building the other houses, that is, on a 50-50 basis with Chaput.

Considering the entire situation, which we have set out in rather full detail, we can come to no other conclusion than that Chaput either knew, or should have known, of the faulty construction by Keenan in building the house purchased by the Dargues. Since the defects caused thereby were latent, and could not possibly have been observed by Dargue when he was making an inspection of the property for the purpose of purchasing it, the Chaputs are liable for the damage to the property caused thereby. The measure of such damages has been stated by this court to be: "In such cases the measure of damages is generally the difference in value between the article or thing purchased if it had been as represented and its actual value." Rankin v. Bigger, 128 Neb. 800, 260 N. W. 202. See, also, Welch v. Reeves, 142 Neb. 171, 5 N. W. 2d 275; Rothery v. Pounds, 150 Neb. 25, 33 N. W. 2d 347.

The evidence of an expert real estate appraiser fixed that amount at $4,287.50. There is no other evidence on this issue. But the Chaputs contend that the Dargues waived any right to damages when they requested that the damage be repaired. The record shows that Dargue made such a request and in response thereto the repairs were made which have hereinbefore been referred

to. It should be observed here that the repairs made to the walls and basement floor were not too satisfactory.

As stated in 37 C. J. S., Fraud, § 69, p. 362: "A right of action for fraud may be waived. Thus, while the defrauded party may retain what he received, stand to his bargain, and recover for the loss occasioned by the fraud, he cannot do so where, having full knowledge, he does an act indicating his intention to waive the fraud. * * * It is, however, difficult and perhaps hazardous to formulate or to apply general rules as to what will constitute such a waiver, and each case in which the question arises must be considered and disposed of on its own special facts, the underlying question being one of intent. * * * Accordingly acts in affirmance of the contract amount to a waiver of the fraud only where they are done with full knowledge of the fraud and of all material facts and with the intention clearly manifested of abiding by the contract and waiving all right to recover for the deception; * * *." See, also, 24 Am. Jur., Fraud and Deceit, § 214, p. 44.

Here the repairs made did not correct the trouble because the parties, at the time they were made, were not fully aware of all the factors that were causing the trouble. In fact, as already stated, the walls continued to crack after they had been made. In view thereof we do not think the Dargues waived their right to recover damages, although they did request that the repairs be made.

The Chaputs ask that they be given credit for the repairs made at Dargue's request, which they testified cost some $1,200. There is no evidence to the effect that they improved the value of the property nor that what was done corrected the cause thereof. In view thereof we think the trial court was correct in denying them any credit therefor.

In view of what we have said and held herein we come to the conclusion that the trial court was correct in rendering the judgment that it did in favor of the

Dargues. We therefore affirm the judgment of the trial court.

AFFIRMED.