Elizabeth Richardson, Testamentary Trustee under the Last Will and Testament of Ralph Newton Perkins, deceased, appellee and cross-appellant, v. The Waterite Company, a Nebraska corporation, appellant and cross-appellee.

99 N. W. 2d 265

Filed November 13, 1959. No. 34550.

*Marks, Clare, Hopkins & Rauth,* for appellant.

*Burbridge & Burbridge* and *Rogers, Field, Gentry & Jackson,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

This is a suit for a declaratory judgment by the trustee of a testamentary trust established by the last will of Ralph Newton Perkins, deceased, to determine the rights of such trustee in a contract entered into by Perkins and the Waterite Company. The trial court held the contract to be valid and decreed that defendant was liable for the amounts agreed upon for items manufactured and sold as set forth in the schedule attached to and made a part of the contract, including any scheduled items which have been improved. The defendant has appealed.

The deceased, Perkins, had been engaged for many years in designing, perfecting, and building a water filter for swimming-pool use. Prior to December 10, 1952, he had designed and was manufacturing and selling what is known in this record as the Perkins filter. It is described as a vacuum diatomite filter and consisted of a tank containing a battery of cylindrically-shaped filters called septa, the number of which in each filter depended upon the volume of water to be filtered. A septum consisted of a cylindrical brass wire mesh skeleton supported at the ends by bronze rings and in between by bronze spider rings. The skeleton was covered by a fine wire mesh metal alloy called Monel. Due to the fact that the septa operated by pulling the water through the Monel and the diatomaceous earth placed on the Monel wire mesh to secure proper filtration by the vacuum pressure exerted by an electric pump, it was necessary to close the end of the cylinder. This was done with bronze caps milled to size and pulled into place by a brass rod extending through the center of the cylinder. It appears that it was necessary that this method be used so that the end caps could be removed in order to clean the septa, the Monel being soldered to the cylinder and consequently not removable for that purpose.

The record shows and the contract indicates that

Perkins and the Waterite Company were, and had been for several years, working together to increase the efficiency of the Perkins septa. Tests were jointly made to discover a more effective and longer lasting material than the Monel cover, such as flannel, Orlon, Nylon, Dynel, and various other plastics, including one known as Saran. On December 10, 1952, with the foregoing situation existing, Perkins and Waterite entered into the contract constituting the basis of this suit.

The contract recites that the parties were engaged in the same line of business and had been closely associated for 5 years prior to the execution of the contract. The contract recites that its purpose was to have Waterite take over the patent interests and manufacturing facilities of Perkins for a period of 10 years. The contract stipulates that it is one in which the parties have a mutual interest.

Briefly stated, Perkins sold his interest in pending patent applications on his vacuum diatomite filter and its component parts, together with manufacturing and sale rights thereto. Perkins agreed to furnish all information he had on the filter and to act as consultant on all matters pertaining to its manufacture and sale during the term of the contract. He also conveyed title to his manufacturing and sales rights in all swimming-pool fittings, cleaning tools, and filter parts, including designs, patterns, core boxes, and special tools. Perkins agreed not to manufacture or sell any of the items enumerated and to submit any new items developed to Waterite for its consideration for 30 days. If Waterite failed to accept such new items within 30 days for manufacture and sale, Perkins was free to do so. All equipment and materials on hand were to be transferred to Waterite, together with all inquiries and pending proposals for swimming-pool and filter equipment.

The contract provided for payments by Waterite to Perkins in four categories described as (1) Equipment and Pattern lists, (2) Intangible list, (3) Shop Material

list, and (4) Schedule of Payment list. Full payment had been made on items (1), (2), and (3) at the time of the trial. The issue in the case was the meaning of item (4) and the amount due thereon.

The following rules are applicable in construing the contract: It is not the province of the court in construing a contract to make a new agreement for the parties by construction; its duty is confined to the interpretation of the one which the parties made for themselves. Johnson v. Loewen, 132 Neb. 389, 272 N. W. 217. Contracts are to be given a reasonable construction in the courts so as to give effect to the intention of the parties thereto and carry out, rather than defeat, the purpose for which they were executed. Gallagher v. Vogel, 157 Neb. 670, 61 N. W. 2d 245; Southwestern Truck Sales & Rental Co. v. Johnson, 165 Neb. 407, 85 N. W. 2d 705.

The Schedule of Payments list attached to the contract was a list of specific parts of the Perkins filter and swimming-pool fittings for the sale of each of which Perkins was to be paid a specified amount by Waterite during the life of the contract. The number of such items sold was testified to by public accountants who examined the books of Waterite. The real controversy involves not only the number of items sold and the price to be paid to Perkins therefor, but whether or not certain items are within the scope of the schedule of payments set out in the contract.

We point out that the contract does not provide that Waterite must manufacture and sell the items listed as designed by Perkins. It does not state that such items have been patented or are subject to patent, which they were not. The agreement contains no express warranty of any kind by Perkins, nor any minimum requirements by Waterite as to volume of sales. The evidence shows that Perkins died on October 16, 1954, and consequently certain provisions of the contract pertaining to the agreement of Perkins to act as consult-

ant and expert adviser to Waterite were thereby terminated. This was an exigency contemplated by the contract when it provided that the contract was to be binding upon the heirs, administrators, and assigns of the parties thereto. On this point the contract also provided that Perkins would render personal service "during the life of this contract, so long as he is able to do so, or until this contract is terminated * * *."

It is contended that Perkins breached the contract in failing to obtain patents on the items upon which commissions were to be paid and that Waterite was thereby damaged in that competitors made use of the same filter at a lesser manufacturing cost. We point out that Perkins did not purport to sell Waterite patented items, nor did he contract that they were patentable. He contracted only to transfer any right to patents that he might have. Waterite relies upon a statement by Perkins in a letter to one Ackley that he had received no royalties on any of the items here involved. The evidence shows that Ackley was a half owner of any patent rights that might be obtained on these items. This would mean that Ackley would be the owner of one-half of any royalties that might accrue from any patent rights obtained. The statement by Perkins to Ackley that he had received no royalties on these items was a truthful one. The commissions that Perkins was to receive from Waterite were not royalties as that term is used in connection with patent rights. Such payments were nothing more than commissions or divisions of profit on items sold which were paid as a part of the consideration of the contract between Perkins and Waterite. We shall hereafter refer to these payments as commissions. The contract is indicative of this intended result when it refers to the payment for such items as "schedule of payments," and makes only a descriptive reference to them as "royalties." The term "royalties" was used throughout the trial in referring to these payments as a convenient descriptive term and

not in the sense of a patent royalty. They are not indicative of any fraud or misrepresentation practiced upon Ackley or Waterite.

Waterite contends that it was induced to enter into the contract by fraud and misrepresentation on the part of Perkins. In this respect it is urged that after the suit was filed Waterite discovered for the first time that Perkins withheld information of defects in the Perkins filter and that subsequent thereto such defects manifested themselves to the serious damage of Waterite. The evidence of fraud and misrepresentation are contained in two letters between Perkins and The International Nickel Company, Inc., bearing the dates of October 27, 1950, and November 3, 1950. The letter of October 27, 1950, from The International Nickel Company, Inc., to Perkins indicates that it was in reply to a letter from Perkins in which three specimens of damaged Monel filter cloth had been enclosed. The substance of the letter of October 27, 1950, is: The failure of specimen 1 does not appear to be due entirely to corrosion, the indications being that mechanical damage may have caused the defect. No corrosion was indicated in other parts of the sample. The crests of the wires on both sides of the Monel cloth were flattened out, probably due to the manufacturing operation and the fact that the breaks occurred in these sections. Specimen 2 indicated no evidence of failure, although discoloration of the specimen was indicated as caused by either sulphur or chlorine present in the water. It was stated that specimen 3 indicated a failure of the Monel cloth and that corrosion was a factor. It was pointed out that Monel is not completely resistant to corrosion, particularly where the Monel does not have continuous contact with water containing 3 grams per liter of available chlorine. It is stated also that the failure of the Monel mesh could be caused by careless operators of swimming pools in permitting excessive concentrations of chlorine resulting in excessive corrosion on filter cloth of such

fine mesh wire as Monel. The findings were that the writer was inclined to believe that the difficulty encountered is associated with the operation of the equipment in not maintaining close control of the elements in the water.

We fail to find any information in the foregoing letter which would apprise Perkins that the Monel covering was defective. It is insufficient as a basis for a claim that Perkins fraudulently withheld information from Waterite that he was required to make known to it to escape a charge of fraud and misrepresentation in entering into the contract of December 10, 1952.

The record discloses additional correspondence between Perkins and The International Nickel Company, Inc., commencing on October 15, 1953, almost a year after the contract in question was made. While these letters have little bearing, if any, on the issue of fraud and misrepresentation, they do indicate that Monel coverings had been used on thousands of filter elements and there had been failures in but two places prior to October 15, 1953. As late as October 26, 1953, Perkins was advised by The International Nickel Company, Inc., that the use of Monel wire mesh as a covering would seem satisfactory in view of the low percentage of failures. It is true that late in 1953 Perkins was advised that possibly other materials than Monel might be more resistant to corrosion. But the recommendations were made more than a year subsequent to the execution of the contract, and we fail to see how they support a claim of fraud and misrepresentation on the part of Perkins in withholding information which admittedly he did not then possess. The following rule applies: To vitiate a contract for failure to disclose pertinent facts amounting to a fraud, the evidence must show that such facts were within the knowledge of the person charged, that a duty to speak existed, that such information was material, and that the suppression of the information tended to induce action which the other party

would not otherwise have taken. 37 C. J. S., Fraud, § 16, p. 244. See, also, Dargue v. Chaput, 166 Neb. 69, 88 N. W. 2d 148.

Waterite further contends that Perkins breached his contract to its damage. On this issue the evidence shows that in 1954 Waterite began having great difficulty with the Perkins filter and was required to make replacements under its warranties at great expense to it. The defendant offered evidence of 16 installations which required extensive repairs and replacements of the septa designed by Perkins. The evidence indicates a total damage of $11,940.39 on these installations and an estimated future damage in a much greater amount. The trial court excluded much of this evidence and finally concluded that none of it was properly admitted on the theory that a breach of contract had not been shown.

It is contended by Waterite that Perkins warranted the Perkins filter and that it was in fact defective in design and failed to function properly because of the tendency of the Monel wire mesh covering to corrode and fail in its function.

Waterite relies upon a statement in the contract as follows: "They also have an interest in producing a quality product at a price which shall be consistent with their cost." Construed in context with the paragraph from which it was taken, the meaning of this sentence becomes clear. The substance of the paragraph is that the parties have a mutual interest in the contract; that Perkins is interested in seeing Waterite sell as many items as possible since he was to receive a commission on each, that Waterite was interested in pushing the sale of these items in order to maintain a manufacturing volume, that both had an interest in producing a quality product at a reasonable price, not as an intended warranty, but to create a public demand for the filter and a consequent increase in sales, and lastly, it was the intention of the parties to fulfill a desire to continue the same friendly cooperative interest between the parties

in the future as in the past. The paragraph was merely a recitation of the reasons why the parties had a mutual interest in the contract. It did not even indicate the existence of an express warranty.

It must be noted that both Perkins and Waterite had been engaged in the manufacture and sale of vacuum diatomite filters for swimming-pool use before the contract was entered into. Perkins was an expert in the field and Waterite also had capable engineers and water-filter experts among its officers and employees. Waterite was thoroughly familiar with the design, construction, and function of the Perkins filter, it having manufactured and sold a limited number of such filters before it entered into the contract. The claimed breach is based primarily on the fact that the use of five different metals in the Perkins filter septum, without insulating each from the others, brought about an electrolytic action that caused the Monel cover to corrode and fail in its function. The danger of using several noninsulated metals and the possibility of electrolytic action was well known to Waterite's experts. In fact, it brought this evidence into the record of this case. The designs furnished by Perkins not only showed the metals to be used, but they showed also their noninsulated use in the septa. It is apparent that Waterite was not mislead by the design and construction of the Perkins filter. Instead it indicates a reliance on its experience in the use of the Perkins filter and the success attained by Perkins in its manufacture and sale. We find no breach of any express warranty in the contract involved in the litigation.

Waterite contends that there was a breach of an implied warranty. In this respect it asserts that the sale of the filter designs and patterns, together with the manufacture and sale rights thereto, was within the provisions of the Uniform Sales Act, sections 69-401 to 69-478, R. R. S. 1943, and the implied warranties set forth therein. We point out at the outset that a stipulation

in the agreement provides that the contract is to be regarded as a conditional sales contract. We point out also that the contract is a lengthy one purporting to set forth expressly the whole agreement of the parties and negativing the idea of implying warranties not expressly made. It is the law that a court will not undertake to make a new contract for the parties by construction. The duty of the court is to interpret the contract the parties made for themselves. It is likewise clear that a court will not imply warranties into a contract where its terms indicate an intention not to make an express or implied warranty. This is consonant with the provision of the Uniform Sales Act that an implication of law under the act may be negatived or varied by express agreement, a course of dealing between the parties, or by custom. § 69-471, R. R. S. 1943. It will be noted that in the instant case Perkins did not sell a single water filter to Waterite. He sold the designs and patterns which he had perfected. The designs indicated the various metals and other materials that were to be used. He sold Waterite his equipment and stock of materials on hand in addition thereto. He sold his manufacture and sale rights to Waterite for the 10-year term of the contract. Both parties were experts in the field of water filtration, particularly for swimming pools. Waterite was fully informed of the nature and kind of materials prescribed by the design. It not only examined the design but it had manufactured and sold filters constructed in accordance with the design. Under such circumstances there is no warranty implied under section 69-415, R. R. S. 1943, of the Uniform Sales Act, which section provides in part: "(3) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed. (4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose." Waterite was fully in-

formed as to the design, materials used, and functional operation of the vacuum diatomite filter developed by Perkins. Waterite cannot rely on an implied warranty as regards defects which its examination ought to have revealed. The trial court correctly found that there was no basis for a claim for damages by Waterite for breach of either an express or implied warranty.

It is further contended by Waterite that material changes have been made in the Perkins filter and that such changes are of such a nature as to relieve Waterite of the payment of any commissions under the schedule of payments portion of the contract. The evidence shows that Waterite suffered many failures in installations of the Perkins filter due to corrosion of the Monel covers of the septa and that it sought a more effective material to use as a cover in lieu of the Monel wire mesh used in the Perkins filter. Tests and experiments were made with various other metals and materials as we have heretofore recited. The evidence shows that Perkins participated in this research. Waterite concluded in 1954 to use a plastic material described as Saran as a more efficient covering than the Monel wire mesh cover. The evidence shows that Perkins was of the opinion that the Saran cover could not be successfully used. The evidence shows, however, that the Saran cover eliminated the difficulties encountered in the use of the Perkins filter due to the corrosion of the Monel wire mesh filter. The use of the Saran cover brought about many changes in the construction of the Perkins filter, which changes, Waterite contends, relieved it of payment to Perkins of the commissions due under the schedule of payments contained in the contract.

The Saran cover was a plastic material resembling a heavy cloth and having much less rigidity than the Monel wire mesh cover. It was sewn in the form of a cylinder and fitted rather loosely over the skeleton of the septum. Its only opening was at the base of the septum. It was closed at the base by a rubber ring which fit snugly

around the base fitting. Diatomaceous earth was applied to it in the same manner as it had been applied to the Monel cover used in the Perkins filter. Many advantages accrued by the use of the Saran filter, advantages that made its use much to be preferred over the Monel cover.

The Saran cover could easily be slipped off of the skeleton of the septum. This permitted the cleaning of the septum by hosing the septum through its framework, an operation that could not be performed through the Perkins filter because the Monel cover was soldered in place and hence could not be removed. This eliminated the necessity for having removable caps in the ends of the septum and permitted the soldering or welding of the end caps to the frame of the septum. This in turn eliminated the brass rod through the center of the septum used to pull the end caps into position. It is these changes, together with the use of the Saran cover, which Waterite contends relieved it of the payment of commissions on the sale of the brass rods, the end caps, the Saran cover, and other component parts, described in the schedule of payments attached to the contract.

It seems clear to us that the elimination of the brass rod eliminated the obligation to pay for it because it was no longer manufactured or sold. The use of the Saran cover likewise eliminated the manufacture and sale of the Monel cover. Since the Monel cover was no longer used, no commissions would be due thereon. It cannot be logically urged that the list of parts on which commissions were to be paid did not relate itself to the component parts of the Perkins filter. New items developed by Perkins were to be included in the schedule of payments list only by supplemental agreement. On the other hand, the brass wire cylinder was still being manufactured and sold. Commissions provided for in the schedule of payments would be due on it under the contract. Commissions on the end caps are required to be paid under the contract, even though they were at-

tached in a different manner made possible by changes in construction due to the use of a removable cover. There is evidence that plastic bushings, and possibly plastic fittings, were developed by Waterite as a further means of eliminating the electrolytic action resulting from the use of several noninsulated metals of varying electromotive potential when exposed to chemically-treated swimming-pool water. Such items are not listed in the schedule of payments, and commissions are not due thereon under the contract. We conclude generally that new items developed by Waterite which displace items of the Perkins filter listed in the schedule of payments in the contract are not subject to the payment of the commissions set out in such schedule. Items contained in the schedule which are retained substantially as designed by Perkins are subject to the payment of such commissions even though changed to some extent to conform to improvements made in the general structure of the Perkins filter.

We again point out that the contract involved more than the sale of the designs and patterns of a water filter for swimming-pool use. It included the skilled personal service of Perkins during the life of the contract. It also involved the transfer of equipment, materials, and tools of Perkins' business, and an agreement to refrain from engaging in such business for a period of 10 years. It involved a transfer to Waterite of the manufacture and sale rights of the Perkins filter. One of the methods for the payment of the consideration of the contract by Waterite was the payment of fixed amounts on certain items manufactured and sold, such items being component parts of the Perkins filter. Such payments were not payments of a royalty, as that term is generally used, but a method of payment only of the consideration due on a contract involving many integrated and diverse provisions. Such a contract must be construed to carry out the contract made as gleaned from its four corners. So interpreting the contract, we

have reached the conclusions herein set forth.

The plaintiff complains on cross-appeal of the failure of the trial court to determine the amount due her under the contract and to enter judgment for such amount. The petition prayed for a judgment for $4,046.12 and interest, the amount claimed to be owing to plaintiff on January 10, 1955, and for such other and further equitable relief as is just and proper. In a declaratory judgment action on a contract, the court may not only construe the contract but it is authorized to enter judgment for the amount due thereunder in the light of the interpretation made. In the instant case plaintiff prayed for judgment for the amount due on January 10, 1955. Further amounts were admittedly due for the years 1955, 1956, and 1957. A judgment for the total amount due at the time of trial should have been entered. The point raised by the cross-appeal is well taken.

While the trial court arrived at substantially the same conclusion as this court as to the construction of the contract, there is merit in the contention advanced that the decree of the trial court was lacking in clarity and definiteness. It failed to specifically declare the rights of the parties in the contract under the issues raised under the pleadings and evidence. This makes it necessary that the cause be remanded to the district court for the entry of a decree in accordance with the holding of this opinion.

Leave is granted to plaintiff, under the provisions of section 25-21,156, R. R. S. 1943, of the Uniform Declaratory Judgments Act, to apply to the district court for Douglas County for such further relief as may be deemed necessary to finally terminate the litigation in accordance with the conclusions reached in this opinion. The applicable rule is: In a declaratory judgment action to have the validity of a written contract and the rights of the parties therein determined, the plaintiff may, after a determination thereof in his favor, obtain a judgment for the amount due him under the contract

by original petition or by subsequent application in the same proceeding. McNally v. Mosher, 210 Md. 127, 122 A. 2d 555, 60 A. L. R. 2d 388.

Even though a reversal of the judgment of the district court is required, the result of the appeal requires that the costs of this appeal be equitably apportioned between the parties. By the authority of section 25-1711, R. R. S. 1943, we direct that each party shall pay his own costs on the appeal.

The judgment of the district court is reversed and the cause remanded with directions to enter judgment in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.